**TYCO VALVES & CONTROLS, L.P., and TV & C GP Holdings, Inc., Appellants,**

**v.**

**Arsenio COLORADO, Steven Craig, Umit Davulcu, Richard Gonzales, Lanny Heinrich, Leonard Hill, Andy Huynh, Chris Kahrig, Lay Keonakhone, Greg Lambousy, Tung Le, Chris Luckey, Fernando Macias, Jorge Martinez, Raul Martinez, Kenneth Nash, Jimmy Phoumlavanh, and Souk Vongsamphanh, Appellees.**

**No. 01–10–00113–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 19, 2012.

**38.** *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.,* 341 S.W.3d 323, 331 (Tex. 2011).

Angela Lynne North, Michael W. Fox, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Austin, TX, James R. Staley, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Houston, TX, for Appellants.

David C. Holmes, Law Offices of David C. Holmes, Houston, TX, for Appellees.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

## OPINION

EVELYN V. KEYES, Justice.

Appellees (collectively, "the Gimpel employees"), sued appellants, Tyco Valves & Controls, L.P. and TV & C GP Holdings, Inc.[1] (collectively, "Tyco") for breach of contract. Following a bench trial, the trial court entered judgment in favor of the Gimpel employees. In nine issues, Tyco appeals, arguing that: (1) the trial court erred by finding that the Gimpel employees' claims were not preempted by the Employee Retirement Income Security Act ("ERISA"); (2) the trial court's finding that the Gimpel employees' contracts were not related to Tyco's ERISA Severance Plan was not supported by legally and factually sufficient evidence; (3) the Gimpel employees' claims are related to ERISA because they sought and were awarded severance pay damages in amounts identical to the severance pay that they would have been due under Tyco's ERISA Severance Plan, as stipulated by the Gimpel employees; (4) the Gimpel employees' claims are related to ERISA because the severance pay amounts the Gimpel employees stipulated they were owed can only be accurately calculated under Tyco's ERISA Severance Plan.; (5) the Retention Incentive Agreements' use of the terms "the standard Severance" and "severance schedule associated with the closure of this facility" are clear references to Tyco's ERISA Severance Plan; (6) the trial court's conclusion that Tyco entered binding and enforceable oral and/or written contracts to pay severance was based on legally and factually insufficient evidence; (7) the trial court's findings concerning alleged oral contracts and an alleged bulletin board posting are legally and factually insufficient; (8) the trial court's finding that the Retention Incentive Agreements are valid and enforceable contracts is not supported by legally and factually sufficient evidence because there was no evidence or insufficient evidence to establish a meeting of the minds regarding the meaning of the term "standard Severance" in the Retention Incentive Agreements; and (9) the evidence supporting the trial court's conclusion that Tyco breached its agreements with the Gimpel employees is legally and factually insufficient.

We reverse and render judgment that appellees take nothing by their claims.

## Background

In 2006, appellees were all employees of Tyco working in a unit that made specialized valves, known as Gimpel valves. The Gimpel Unit was located in Tyco's West Gulf Bank facility, which also housed several other Tyco units. The appellees per-

---

1. TV & C GP Holdings, Inc. is the general partner of Tyco Valves & Controls, L.P.

formed a variety of different functions within the Gimpel Unit.

In mid–2006, Tyco decided to close the West Gulf Bank Facility and began to relocate or sell the various units housed there. Holly Kriendler, the Human Resources Director of Tyco, created a document titled "Tyco Valves and Controls Severance," (hereinafter "West Gulf Bank Severance Schedule") which provided:

Effective August 1, 2006, Tyco Valves and Controls West Gulf Bank location will follow the following Severance schedule.

Salaried employees will receive 2 weeks of pay continuation for each full year of continuous service, subject to a minimum of 6 weeks and a maximum of 26 weeks.

Hourly employees will receive 1 week of pay continuation per full year of continuous service, subject to a minimum of 6 weeks and a maximum of 26 weeks.

This policy shall apply to bands 4—7 and supersede any prior plan, program or policy under which the Company provided severance benefits prior to the Effective Date of the Policy.

This document listed conditions that must be met, including executing and complying with a release provided by the company and authorizing the deduction of amounts owed to the company prior to the payment of severance. It concluded with a list of circumstances in which employees would not be eligible for severance benefits, but it did not include any provisions relating to termination of employment due to a sale or outsourcing of the unit or relating to calculation of an employee's years of service when the service was not continuous.

In December 2006, Tyco announced that it would attempt to sell the Gimpel Unit. In connection with this process, the Gimpel employees entered into various Retention Incentive Agreements ("RIAs") that were signed by eleven of the Gimpel employees and either Sal Vaccaro, the plant manager, or Paddy Warman, Tyco's Human Resources representative. These agreements were all dated between January 5, 2007 and January 15, 2007 and were made "by and between Tyco Valves and Controls, its successors and assigns ('Tyco' or 'Company')," and the specific employee listed in each RIA. The RIAs expressed Tyco's desire to retain the employees named in the RIAs because Tyco considered the "continuing services, leadership and support by Employee during the Retention Period (as defined below) to be very important to the ongoing effective management and maintenance of the facility."

The RIAs provided that if the employee stayed through the retention period, Tyco would pay:

(i) in the event that the Employee is not offered Comparable Employment with Tyco, an amount equal to [between $3,000 and $10,000] (Retention Bonus) plus the standard Severance in accordance to the severance schedule associated with the closure of this facility....

OR

(ii) in the event that the Employee is offered Comparable Employment with Tyco, a cash payment of [between $3,000 and $10,000] subject to the Employee's acceptable performance during the Retention Period.

The RIA defined "Comparable Employment":

For purposes of this agreement, Comparable Employment shall mean that within 30 days after the end of the Retention Period, the Employee is offered employment with ["Tyco"] of comparable pay, status and skill level at a location that is

within 25 miles of Employee[']s current work location.

Finally, the RIAs provided:

This Agreement sets forth the entire understanding of Tyco and the employee, and supersedes all prior agreements and communications, whether oral or written, pertaining to eligibility for stay incentives of the type described herein.... This Agreement shall not be modified except by written agreement of the Employee and Tyco.

The RIAs did not state a specific dollar amount of severance benefits or provide a severance schedule.

In April 2007, Dresser Rand Company ("Dresser Rand") agreed to purchase the Gimpel Unit. As part of that transaction, Tyco and Dresser Rand entered into an Asset Purchase Agreement. In relevant part, that agreement states that the "Purchased Assets transferred ... will exclude the following assets[:] ... all Seller Benefit Plans, the assets thereof and the benefits available to participants thereunder ..."

The Asset Purchase Agreement further states that Dresser Rand shall not assume liability for

(i) any wages, salary, severance, bonuses ... (ii) any duties, obligations or liabilities arising under any employee benefit plan, policy, or practice ... or (iii) any other amounts due to any employees or former employees of the Business, in each case which accrue or arise prior to the Closing Date....

In the section of the Asset Purchase Agreement concerning covenants and agreements on employees, the agreement states:

Purchaser shall at the Closing (or as soon as practicable thereafter) offer employment to all or substantially all of Seller's employees involved in the oper-
ation of the Business and listed on *Schedule 4.1(a)* (the "Prospective Employees") at substantially the same base salary or hourly rate as such Prospective Employees are employed by Seller immediately prior to closing.... All Prospective Employees ... who accept Purchaser's offer of employment (the "Hired Employees") shall become employees of Purchaser as of the date specified in the offer letter delivered to each such Hired Employee in accordance with Section 4.1 or such later date that such Hired Employee satisfies Purchaser's conditions of employment including, without limitation, background checks and drug testing. Seller shall terminate the employment of each Prospective Employee with Seller immediately prior to the date on which such person becomes a Hired Employee. Each Hired Employee shall be eligible, from and after the first day of the month following the date on which such Hired Employee becomes an employee of Purchaser, for the same benefit plans of Purchaser as those offered to similarly situations employees of Purchaser; *provided,* that each Hired Employee, shall be eligible for coverage under Purchaser's short-term disability plan(s) from and after the date on which such Hired Employee becomes an employee of Purchaser. Following the Closing Date, Purchaser shall ensure that no exclusions or limitations with respect to any pre-existing conditions, evidence of insurability or good health are applicable to any Hired Employees or their dependents or beneficiaries under any health plan(s) in which such Hired Employees may be eligible to participate.

Thus, the agreement between Tyco and Dresser Rand provides that, after a prospective employee accepted an offer of employment with Dresser Rand, Tyco would

terminate that employee. The Asset Purchase Agreement states:

> Notwithstanding anything to the contrary contained in this Agreement, [Tyco] shall be solely responsible for the payment of any and all compensation, retention, separation, severance or similar payments due or to become due to any employee of [Tyco] (including any Prospective Employee or any Hired Employee) pursuant to any agreement, arrangement, commitment, applicable law, plan or course of dealing between such employee and [Tyco], including without limitation any termination payments or termination obligations arising in connection with this Agreement.

Subsequent to the sale of the Gimpel Unit to Dresser Rand, all of the Gimpel employees who are appellees in this case were offered continued employment with Dresser Rand. It is undisputed that the Gimpel employees stayed with the Gimpel Unit through the end of the retention period and that Tyco paid the retention bonuses as provided by the RIAs. The Gimpel employees were able to begin working for Dresser Rand immediately following their termination from Tyco, and they worked in positions largely identical to those they held with Tyco, with largely identical seniority, benefits, and supervisors. It is also undisputed that Tyco did not pay any severance to the Gimpel employees.

On March 31, 2008, the Gimpel employees filed suit against Tyco for breach of contract. They alleged that "[t]he parties understood that the standard severance would be paid if Tyco Valves sold [the Gimpel Unit] to another company, and Plaintiffs entered into the contracts with that understanding." The Gimpel employees further alleged that they were not offered comparable employment with Tyco and instead became employees of Dresser Rand, "which merely purchased assets from Tyco Valves and is not a successor to Tyco Valves." Thus, the Gimpel employees asserted that Tyco breached its contracts with them by failing to pay severance in accordance with the RIAs or oral agreements. Tyco denied these claims, and it argued that it completely fulfilled its contractual obligations because it required Dresser Rand to offer all Gimpel employees comparable employment.

At trial, Lanny Heinrich, one of the Gimpel employees who entered into an RIA, testified regarding his understanding of the RIA agreement and the severance provision contained in it. He was told that his retention bonus was smaller than that received by other employees because his lengthy employment with Tyco meant that he would receive 26 weeks of severance when the Gimpel Unit was sold.

The Gimpel employees introduced and relied upon the West Gulf Bank Severance Schedule created by Holly Kriendler, the Human Resources Director of Tyco, as the severance schedule referred to in the RIAs and applicable to all employees at the West Gulf Bank Facility. Kriendler testified at trial that she created the West Gulf Bank Severance Schedule for her own personal use. However, the document itself does not contain any such disclaimer or other notation limiting or qualifying its applicability. Kriendler also testified that the majority of the West Gulf Bank Severance ·Schedule was copied directly from Tyco's ERISA Severance Plan and that she created a slightly different benefit schedule under the mistaken belief that she had the authority to do so.

Several Gimpel Unit employees, including Christopher Kahrig and Lanny Heinrich, testified that they were aware of and relied upon the severance terms provided in the West Gulf Bank Severance Schedule. Kahrig, in particular, testified that he saw the West Gulf Bank Severance

Schedule posted on the bulletin board outside the cafeteria at the West Gulf Bank Facility around January 2007. The Gimpel employees also produced several e-mails referring to the West Gulf Bank Severance Schedule as the severance policy used during the closing of various facilities, including the West Gulf Bank Facility, and discussed at "town hall meetings." The employees' testimony relayed severance terms consistent with the West Gulf Bank Severance Schedule created by Kriendler.

Chris Luckey was the only Gimpel employee claiming breach of an oral agreement to testify. He stated that Warman, Tyco's HR representative, told him not to leave or he would not receive severance pay. Luckey did not testify regarding the specific severance pay Warman was referring to in making that statement, nor did Luckey testify regarding what specific severance pay benefits he was expecting to receive.

Tyco introduced into evidence its official company-wide severance plan ("Tyco's ERISA Severance Plan"). This plan was the plan in effect beginning December 1, 2006. The relevant provisions include:

- A specific provision that the plan "is intended to be a 'welfare benefit plan' within the meaning of Section 3(1) of ERISA";
- Section 2.08, providing that " 'Company' shall mean Tyco International Ltd. Unless otherwise clear from the context, Company shall generally indicate participating Subsidiaries."
- Section 2.10, defining an "Eligible Employee" as one "who is not covered under any other severance plan or program sponsored by the Company or a Subsidiary other than the Tyco International Employee Transition Benefits Plan and the Tyco International Employment Incentive Payment Plan. . . .";

- Section 2.14, defining "Involuntary Termination" as meaning "a termination of the Participant initiated by the Company . . . for any reason other than Cause, Permanent Disability or death, as provided under and subject to the conditions of Article III [of the plan]";
- Section 2.18, providing that " 'Plan' means the Tyco International (US) Inc. Severance Plan for U.S. Employees as set forth herein, and as the same may from time to time be amended."·
- Section 2.19, providing that " 'Plan Administrator' shall mean the individual(s) appointed by the Committee to administer the terms of the Plan as set forth herein and if no individual is appointed by the Committee to serve as the Plan Administrator for the Plan, the Plan Administrator shall be the Senior Vice President—Human Resources, Tyco International (or the equivalent). . . . "
- Section 2.22, providing that " 'Severance Benefit' shall mean the salary continuation amounts and other benefits that a Participant is eligible to receive pursuant to Article IV of the Plan." The Plan does not provide a definition of "Severance." The term "Severance Period" is defined as "the period during which a Participant is receiving Severance Benefits under this Plan."
- Section 3.02, providing the conditions that an employee must satisfy to be eligible to receive severance benefits as described in the plan. Specifically, Section 3.01(b)(ix) provides that "An Eligible Employee will not be eligible to receive severance benefits" when "[t]he Eligible Employee's employment with the Employer terminates as a result of a sale of stock or assets of the Employer, merger, consolidation, joint venture or a sale or outsourcing

of a business unit or function, or other transaction, and the Eligible Employee accepts employment, or has the opportunity to continue employment (without regard to whether the offer of employment is for an Alternative Position), with the purchaser, joint venture, or other acquiring or outsourcing entity, or a related entity of either the Company or the acquiring entity.

- Section 3.02(c), providing that "[t]he Plan Administrator has the sole discretion to determine an Eligible Employee's eligibility to receive Severance Benefits";

- Article Four, providing that the Severance Benefits include notice pay of 14 calendar days in addition to other Severance Benefits, "Salary Continuation . . . as set forth under the benefits schedule appended to the Plan," payment of the employee's pro-rated annual bonus, and continued eligibility to participate in medical, dental and Health Care Reimbursement Account coverage during the Severance Period. Article Four also contains provisions for dealing with "Stock Options and Other Long–Term Incentive Awards . . . in accordance with the terms of the applicable plan and/or individual award agreements under which such awards were issued." Finally, Article Four provides that Severance Benefits under the Plan are not owed if the employee voluntarily resigns, dies, becomes permanently disabled, or is terminated for cause.

- Section 5.02, regarding "Other Arrangements," stating, "[T]he Severance Benefits under this Plan are not additive or cumulative to severance or termination benefits that a Participant might also be entitled to receive under the terms of a written employment agreement, a severance agreement or any other arrangement with the Employer . . . . The provisions of this Plan may provide for payments to the Eligible Employee under certain circumstances or bonus plans under circumstances where such plans would not provide for payment thereof. It is the specific intention of the Company that the provisions of this Plan shall supersede any provisions to the contrary in such plans, to the extent permitted by applicable law, and such plans shall be deemed to be have [sic] been amended to correspond with this Plan without further action by the Company or the Board."; and

- The schedule for severance benefits appended to this plan, which provides that "[p]articipants other than Band 3 employees" [2] will receive severance pay consisting of "1 week [pay] for each full year of service, subject to a minimum of 2 weeks and a maximum of 52 weeks," and that "Band 3 employees" will receive "2 weeks [pay] for each full year of service, subject to a minimum of 26 weeks and a maximum of 52 weeks."

Tyco also presented evidence that, on February 27, 2007, Laurie Siegel, Tyco International's Senior Vice President of Human Resources, adopted a new schedule of benefits for the employees of the West Gulf Bank Facility, retroactively effective as of December 1, 2006. The new severance benefits schedule provided that certain hourly employees ("Band 4—7" employees) would receive one week of sev-

2. The definitions for the various "bands" of employees are not included in the record. However, none of the parties' arguments depend upon which "band" the employees belonged to, and each Gimpel employee entered into an agreed stipulation regarding the amount of severance he was allegedly owed.

erance for each year of service, with a minimum of six weeks and a maximum of twenty-six weeks, while salaried employees would receive two weeks for each year, subject to the same minimum and maximum standards as the hourly employees. "Band 3 employees" would be eligible for two weeks of severance pay for each full year of service subject to a minimum of twenty-six weeks and a maximum of fifty-two weeks.

The parties also introduced a joint exhibit that provided a stipulation as to various facts such as respective dates of hire, dates of termination, last rates of pay, subsequent employment with Tyco or Dresser Rand, "and—assuming that they are entitled to a severance under the Tyco Valves & Controls, L.P.'s severance plan—the calculated amounts of severance under the plan."

The trial court granted judgment in favor of the Gimpel employees against Tyco and awarded damages according to the parties' stipulation. The trial court made numerous findings of fact and conclusions of law, including that ERISA did not preempt the Gimpel employees' claims, that the RIAs and oral agreements were valid and enforceable, and that Tyco breached those agreements by failing to pay severance in accordance with the terms of the West Gulf Bank Severance Schedule. Tyco filed this appeal challenging the trial court's judgment.

## Standard of Review

In an appeal of a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal sufficiency of the evidence used to support them just as we would review a jury's findings. *Daniel v. Falcon Interest Realty Corp.*, 190 S.W.3d 177, 184 (Tex.App.-Houston [1st Dist.] 2005, no pet.) (citing

*Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994)). In conducting a legal-sufficiency review, we credit favorable evidence if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005); *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex.App.-Houston [1st Dist.] 2007, no pet.). We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. We sustain a no-evidence contention only if: (1) the record reveals a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997).

In reviewing a challenge to the factual sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986)). The trial court acts as fact-finder in a bench trial and is the sole judge of the credibility of witnesses. *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex.App.-Houston [1st Dist.] 2005, no pet.). We review a trial court's conclusions of law de novo, and we will uphold the conclusions if the judgment can be sustained on any legal theory supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789,

794 (Tex.2002); *In re Moers,* 104 S.W.3d 609, 611 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

### ERISA Preemption [3]

Tyco's central argument, as articulated in its first through fourth issues, its fifth issue, and its eighth issue, is that the trial court erred by finding that the Gimpel employees' claims were not preempted by ERISA, and, thus, it erred in finding that Tyco was obligated to pay severance benefits to the Gimpel employees. In essence, it argues that reference to the terms of Tyco's ERISA Severance Plan is essential to determine its obligation to the Gimpel employees under the RIAs or under any alleged oral agreements, and, therefore, recourse to the ERISA Plan is necessary to determine each employee's damages. Thus, the Gimpel employees' claims that Tyco breached the terms of the RIAs and oral agreements by failing to pay them the severance benefits offered under those agreements are preempted by ERISA and are claims for benefits under the terms of an ERISA plan. The Gimpel employees argue that the RIAs and oral agreements

on which they base their breach of contract claims were not part of or related to Tyco's ERISA Severance Plan.[4] They claim—and the trial court found—that they are entitled to damages under state law for Tyco's breach of their individual written RIAs and oral agreements. Accordingly, the first question is whether the Gimpel employees' claims for breach of their oral and written agreements to pay severance were preempted by ERISA, as presented in Tyco's first five issues and part of its eighth.

■■■ Congress enacted ERISA as a comprehensive system to regulate employee benefit plans ' "to promote the interests of employees and their beneficiaries in employee benefit plans' ... and 'to protect contractually defined benefits.' " *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983) and *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985)); *Ambulatory Infusion Therapy Specialist, Inc. v. N. Am. Adm'rs,*

---

**3.** Justice Sharp joins this portion of Justice Keyes's opinion, agrees that the Gimpel employees' claims are not preempted by ERISA, and analyzes their claims under state contract law principles.

**4.** Specifically, in its first issue, Tyco argues that the trial court erred in finding that the Gimpel employees' claims were not preempted by ERISA. In its second issue, it argues that the trial court's findings that the Gimpel employees' contracts were not related to Tyco's ERISA Severance Plan are not supported by legally and factually sufficient evidence. In its third issue, it argues that the Gimpel Employees' claims are related to ERISA because "the [Gimpel employees] sought and the trial court awarded them severance pay damages in amounts identical to the severance pay that they would have been due under Tyco's ERISA-governed severance plan, and [the Gimpel employees] stipulated

that the amounts were calculated in accordance with the terms of Tyco's Severance Plan." In its fourth issue, it argues that the Gimpel employees' claims are related to ERISA because the severance pay amounts that the Gimpel employees stipulated they were owed can only be calculated under Tyco's ERISA Severance Plan. In its fifth issue, it argues, in support of its claims, that the RIAs' use of the terms "the standard Severance" and "severance schedule associated with the closure of this facility" are clear references to Tyco's ERISA Severance Plan. And, in its eighth issue, it argues that the trial court's conclusions that the RIAs are valid and enforceable contracts is not supported by legally and factually sufficient evidence because there was no evidence or insufficient evidence to establish a meeting of the minds regarding the meaning of the term "standard Severance" in the RIAs.

*Inc.*, 262 S.W.3d 107, 112 (Tex.App.-Houston [1st Dist.] 2008, no pet.). The act regulates both pension plans and welfare plans that provide benefits for contingencies such as illness, accident, disability, death, or unemployment. *Cathey v. Metro. Life Ins. Co.*, 805 S.W.2d 387, 388 (Tex.1991); *Ambulatory Infusion*, 262 S.W.3d at 112. While it provides standards and rules governing reporting, disclosure, and fiduciary responsibility for pension and welfare plans, ERISA does not mandate any particular benefits. *Shaw*, 463 U.S. at 91, 103 S.Ct. at 2896–97; *Ambulatory Infusion*, 262 S.W.3d at 112. ERISA section 1002(1) provides:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such a plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ... benefits in the event of ... unemployment....

29 U.S.C. § 1002(1) (2006).

ERISA section 1132 provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* § 1132(a)(1)(B). The statute further provides for concurrent jurisdiction in federal and state courts over actions brought under section 1132(a)(1)(B) of the Act. *Id.* § 1132(e). Except for actions under this subsection, the United States district courts have exclusive jurisdiction over civil ERISA actions. *Id.*

 ERISA also includes expansive preemption provisions, which are intended to ensure that the regulation of employee benefit plans be "exclusively a federal concern." *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 523, 101 S.Ct. 1895, 1906, 68 L.Ed.2d 402 (1981); *Ambulatory Infusion*, 262 S.W.3d at 113. To this end, Congress has statutorily provided that ERISA "shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan." 29 U.S.C. § 1144(a) (2006) (emphasis added); *Ambulatory Infusion*, 262 S.W.3d at 113. ERISA preemption applies not only to state laws but to all forms of state action dealing with the subject matters covered by the statute. 29 U.S.C. § 1144(c)(1); *Shaw*, 463 U.S. at 98, 103 S.Ct. at 2900; *Ambulatory Infusion*, 262 S.W.3d at 113. Accordingly, when a state court suit, alleged in terms of a state common-law or statutory cause of action, "relates to" an employee welfare benefit plan, ERISA may preempt the state law in favor of federal law. *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–67, 107 S.Ct. 1542, 1546–48, 95 L.Ed.2d 55 (1987); *Gorman v. Life Ins. Co. of N. Am.*, 811 S.W.2d 542, 545 (Tex.1991); *Ambulatory Infusion*, 262 S.W.3d at 113.

 Thus, to determine whether a state law has the forbidden connection to ERISA, we look to both the objectives of ERISA and the effect of the asserted state law on an ERISA plan. *Egelhoff v. Egelhoff*, 532 U.S. 141, 147, 121 S.Ct. 1322, 1327, 149 L.Ed.2d 264 (2001); *Ambulatory Infusion*, 262 S.W.3d at 113. Because ERISA is deemed to be comprehensive with regard to the remedies provided and excluded, any state law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the congressional intent to make the ERISA remedy exclusive and is preempted. *Ambulatory Infusion*, 262 S.W.3d at 113 (citing *Aetna Health, Inc. v. Davila*,

542 U.S. 200, 209, 124 S.Ct. 2488, 2495, 159 L.Ed.2d 312 (2004)).

The ERISA preemption provision is to be broadly construed. *See Davila,* 542 U.S. at 216–17, 124 S.Ct. at 2500; *Ambulatory Infusion,* 262 S.W.3d at 113. In accordance with this policy, the Supreme Court has held that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw,* 463 U.S. at 96–97, 103 S.Ct. at 2900. However, the Supreme Court has also cautioned that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21; *Ambulatory Infusion,* 262 S.W.3d at 113.

In *Fort Halifax Packing Co. v. Coyne,* the Supreme Court limited its ruling in *Shaw,* holding that the preemption provision of ERISA was intended only to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. 482 U.S. 1, 11, 107 S.Ct. 2211, 2217, 96 L.Ed.2d 1 (1987). Because this concern arises only with respect to benefits whose provisions by nature require an ongoing administrative program to meet the employer's obligation, the Court held that Congress intended only to preempt state laws relating to ERISA *plans* rather than those simply relating to *benefits. Id.* It pointed out that some severance benefit obligations, by their nature, necessitate an ongoing administrative scheme, while others do not. *Id.* at 18, 107 S.Ct. at 2221. And it held that those that do not necessitate an ongoing administrative scheme "simply do not involve a state law that 'relate[s] to' an employee benefit 'plan.' " *Id.* Accordingly, the Court held that the state statute at issue, which required a one-time lump-sum severance payment to employees in event of their plant's closing, did not require an administrative scheme that created the potential for the type of conflicting regulation of benefit plans that ERISA preemption was intended to prevent, and, therefore, the state statute was not preempted by ERISA.

Following *Fort Halifax,* the Fifth Circuit held, in *Tinoco v. Marine Chartering Co.,* that ERISA did not govern a dispute between an employer and officers of a company acquired by the employer who had been given the right to participate in the employer's early-retiree health care plan as a severance benefit where the employer had offered the officers the choice of a lump-sum payment or a stream of payments until age 62, and, regardless of the option the officers chose, the total amount to be paid was based on a one-time calculation using a fixed formula that required no ongoing administrative scheme or discretionary decisions by the plan administrator. 311 F.3d 617, 622–23 (5th Cir.2002). Similarly, the Fifth Circuit has held that "a one-time lump sum payment, contingent upon an event that may never materialize, 'create[s] no need for an ongoing administrative program to process claims and pay benefits' and therefore is not a plan" subject to ERISA. *Peace v. Am. Gen. Life Ins. Co.,* 462 F.3d 437, 441 (5th Cir.2006) (holding that claim alleging breach of contract to provide annuity purchased with single premium payment was akin to one-time severance benefit and did not constitute employee benefit plan under ERISA); *see also Fontenot v. NL Indus., Inc.,* 953 F.2d 960, 961, 963 (5th Cir.1992) (holding that, because severance plan involved only one-time lump sum payment triggered by single event and required no administrative scheme, ERISA did not preempt claims arising from senior executive severance plan which provided that if

executive were terminated within two years of change in control, company would pay executive lump sum cash payment of three times his highest annual salary for preceding three years plus three-year continuation of certain benefits); *Wells v. Gen. Motors Corp.*, 881 F.2d 166, 168, 176 (5th Cir.1989) (holding that ERISA did not preempt claims arising from separation agreement negotiated after announcement of layoffs which provided that employees could opt for severance payment in lieu of preserving seniority and rehire rights, because plan was not ongoing, even though employees could elect two-year installment payment option, and there was no need for continuing administration of payment program).

In addition, several federal courts outside the Fifth Circuit have addressed instances in which employers allegedly made promises to employees to pay severance benefits outside of existing ERISA-covered severance plans. In *Eide v. Grey Fox Technical Services Corp.*, the plaintiffs alleged that Ceridan, their employer, had made an oral promise to pay them a lump sum severance benefit in the event that their unit was sold to another company and the buyer terminated the employees within one year of the unit's sale. 329 F.3d 600, 603 (8th Cir.2003). The Eighth Circuit concluded that, "[a]lthough the benefits to be paid to Employees were calculated according to the formulas provided by [Ceridan's ERISA-covered plan], they were not to be delivered pursuant to that plan," and it concluded that "no ongoing administrative scheme" was required for Ceridan to meet its obligations; thus, Ceridan's promise of severance pay did not "relate to" an ERISA plan. *Id.* at 606.

The holding in *Eide* was similar to the Eighth Circuit's previous holding in *Crews v. General American Life Insurance Co.*, 274 F.3d 502 (8th Cir.2001). There, the

court held that the employer's contractual obligation to pay severance was independent of its ERISA plan; therefore, the breach of contract claim was not preempted by ERISA. *Id.* at 505–07. In reaching this conclusion, the court noted that the independent agreement provided a higher amount of benefits to the employees and did not provide any discretion to the employer. *Id.* at 505.

The Fourth Circuit has also considered whether an employer's offer of severance benefits separate from those offered by the employer's ERISA-governed severance plan was covered by ERISA. *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 259 (4th Cir.2005). It held that the separate severance benefit agreement with the plaintiff operated independently from the ERISA-governed severance plan. *Id.* It noted that there were "substantial differences" between the plaintiff's severance benefits in his employment agreement and the terms of the ERISA-governed severance plan—specifically, the greater amount of benefits promised under the separate agreement—and that the severance award under the separate agreement would not be paid out of funds allocated to the ERISA-governed severance plan. *Id.* The court also noted that it was unclear whether the separate agreement incorporated the ERISA-governed severance plan by reference, but that "nothing in the remainder of the employment agreement indicates that the Severance Plan even exists." *Id.* at 261.

The same policy has been followed in the only previous Texas state court case that has directly confronted this issue. *Greathouse v. Glidden Co.*, 40 S.W.3d 560, 566–67 (Tex.App.-Houston [14th Dist.] 2001, no pet.). In that case, the court of appeals held that ERISA preempted claims based on a plan providing for the payment of severance benefits because the plan re-

quired the determination of eligibility for benefits over an indefinite period of time, which necessarily required an ongoing administrative scheme. *Id.*

Thus, in order to determine whether ERISA preempts the Gimpel employees' claims, we must determine whether they are attempting to enforce their right to receive benefits under the terms of Tyco's ERISA Severance Plan, to be administered in accordance with the ongoing administrative scheme set out in that plan, or under separate agreements that did not require ongoing administration under the scheme set out in Tyco's ERISA Severance Plan.

### A. Meaning of the Term "Standard Severance" in the Gimpel Employees' Agreements

The Gimpel employees base their breach of contract claims on two different types of agreements: twelve employees base their claims on written RIAs, and the remaining six employees base their claims on alleged individual oral agreements. The Gimpel employees claim that Tyco promised to pay severance under both types of agreements if the employees continued working at the Gimpel Unit until it was closed or sold. The RIAs refer to "standard Severance in accordance to the severance schedule associated with the closure of this facility." The Gimpel employees also assert that the only severance schedule of which they were aware, and the schedule upon which their claims for breach of contract damages are based, was the West Gulf Bank Severance Schedule. Thus, the employees argue that the severance payments promised in both types of agreements were to be paid according to the West Gulf Bank Severance Schedule, which, they contend, was an independent document not related to Tyco's ERISA Severance Plan.

Tyco, however, contests the Gimpel employees' interpretation of the terms of their agreements, and it argues that the trial court's findings of fact and conclusions of law on this point are not supported by legally and factually sufficient evidence. It contends that it was obligated to pay severance to the Gimpel employees as provided by its ERISA Severance Plan, that the RIAs refer to this plan and must be interpreted in accordance with it, and that the West Gulf Bank Severance Schedule was an unauthorized document that did not modify the terms of its ERISA Severance Plan.

In its fifth and eighth issues, Tyco argues that the Gimpel employees offered no evidence or insufficient evidence that the term "standard Severance" in the RIAs referred to the West Gulf Bank Severance Schedule; rather, Tyco argues that the RIAs' use of "standard Severance" is a reference to Tyco's ERISA Severance Plan. However, the Gimpel employees argue that the reference to "standard Severance in accordance to the severance schedule associated with the closure of this facility" referred to the West Gulf Bank Severance Schedule. They also argue that the oral agreements were based on the West Gulf Bank Severance Schedule because it was the only plan Tyco provided to any of the Gimpel employees.

We, therefore, must determine whether the contracts with the Gimpel employees were ambiguous and, if so, whether the trial court's findings as to the meaning of the contested terms are supported by sufficient evidence.

The issue of whether a contract is ambiguous is a question of law that we review de novo. *DeClaris Assocs. v. McCoy Workplace Solutions, L.P.,* 331 S.W.3d 556, 562 (Tex.App.-Houston [14th Dist.] 2011, no pet.) (citing *Bowden v. Phillips Petroleum Co.,* 247 S.W.3d 690, 705 (Tex.2008)). If a contract's meaning is

uncertain, or it is reasonably susceptible to more than one interpretation, then it is ambiguous and its meaning must be resolved by the finder of fact. *Id.* (citing *Lenape Res. Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996)). An ambiguity in a contract may be patent or latent. *Id.* Patent ambiguity is apparent on the face of the contract, while latent ambiguity only becomes apparent when a facially unambiguous contract is applied under particular circumstances. *Id.* (citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995)).

Here, we conclude that the RIAs contained a latent ambiguity. *See id.* The ambiguous meaning of "standard Severance" became apparent only once the parties attempted to determine what severance, if any, was owed to the Gimpel employees. *See id.* The trial court, as finder of fact, resolved this ambiguity by concluding that the term "standard Severance in accordance to the severance schedule associated with the closure of this facility" referred to the West Gulf Bank Severance Schedule.

■ A trial court's findings of fact may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996) (per curiam) (citing *Cain,* 709 S.W.2d at 176). Appellate courts review the trial court's conclusions of law de novo and will uphold the conclusions if the judgment can be sustained on any legal theory supported by the evidence. *See BMC Software,* 83 S.W.3d at 794.

The trial court found that Kriendler created the West Gulf Bank Severance Schedule in connection with a prior restructuring and communicated its terms to all of the Gimpel employees through direct communications between HR personnel and the employees, through communications by su-

pervisory personnel, through bulletin board postings, or through a combination of those means. The trial court also found that HR personnel made oral assurances to the employees that they would indeed receive severances. The trial court specifically found that Kriendler's testimony—that the West Gulf Bank Severance document was not an actual severance schedule and instead was just her way of learning Tyco's ERISA Severance Plan—was not credible because of the e-mails admitted into evidence. The trial court also found that Kriendler's e-mails admitted that the terms of the West Gulf Bank Severance Schedule had been communicated to all employees, either in writing or orally, and was the policy used during a previous restructuring.

The trial court concluded that the RIAs were valid and enforceable contracts, which unambiguously provided that employees would receive severance to be calculated by reference to the West Gulf Bank Severance Schedule. The trial court also concluded that these agreements were independent from Tyco's ERISA Severance Plan.

■ We conclude that the findings of the trial court are supported by legally and factually sufficient evidence. The wording of the West Gulf Bank Severance Schedule itself states that it is "Effective August 1, 2006" and that "Tyco Valves and Controls West Gulf Bank location will follow the following Severance schedule." Thus, by its own plain language, the West Gulf Bank Severance Schedule purports to be the "severance schedule associated with the closure of [the West Gulf Bank] facility." Furthermore, e-mails and testimony indicated that Kriendler used the West Gulf Bank Severance Schedule during previous restructuring, that all employees had been notified of that severance schedule either orally or in writing, and that certain

Tyco employees were aware Tyco had promised severance to the Gimpel employees on those terms. Heinrich and Kahrig testified that the terms of the West Gulf Bank Severance Schedule were the only severance terms of which they were aware, were the terms discussed with them when they entered into the RIAs, and were the terms posted on bulletin boards and discussed at town hall meetings. This evidence supports the trial court's conclusion.

Although Kriendler testified that the West Gulf Bank Severance Schedule was not a separate severance schedule and that she merely created it to help her learn about Tyco's ERISA Severance Plan, the trial court specifically found that her testimony on this matter lacked credibility. We defer to this determination of the trial court. *See HTS Servs., Inc.*, 190 S.W.3d at 111.

We also observe that the severance schedule adopted by Tyco International on February 27, 2007 as an amendment to its ERISA-covered Severance Plan cannot, under the plain language of the RIAs, be the "severance schedule associated with the closure of this facility" because it was not adopted until after all of the Gimpel employees signed their RIAs. The RIAs included a provision that they "shall not be modified except by written agreement of the Employee and Tyco." Nothing in the record indicates that the Gimpel employees agreed in writing to the amendment of the severance schedule, and, in fact, the testimony of various employees at trial indicated that they were not aware of any severance schedule except for the West Gulf Bank Severance Schedule.

Finally, we observe that the West Gulf Bank Severance Schedule does not meet the requirements to be considered an ERISA plan. It is not an "employee welfare benefit plan" or "welfare plan" as defined by ERISA section 1002(1). That

section defines those terms as "any plan, fund, or program ... established or maintained by an employer ... for the purpose of providing for its participants ... benefits in the event of ... unemployment...." 29 U.S.C. § 1002(1); *see also Greathouse*, 40 S.W.3d at 565 ("A plan under ERISA is established if, from the surrounding circumstances, a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.") (citing *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982)). The West Gulf Bank Severance Schedule does not contain complete information regarding the source of financing or procedures for receiving benefits, it was not filed with the United States Department of Labor, it did not apply to all of Tyco's employees—just to the ones involved in the closure of the West Gulf Bank Facility—and it was not comprehensive. *See Greathouse*, 40 S.W.3d at 565–66.

Furthermore, this document is not subject to ERISA because it does not create benefits requiring an ongoing administrative program to meet the employer's obligation. *See, e.g., Tinoco*, 311 F.3d at 622–23. Nor can the West Gulf Bank Severance Schedule be considered a modification of an ERISA plan. ERISA requires that a plan "provide a procedure for amending such a plan, and for identifying the persons who have authority to amend the plan." *Greathouse*, 40 S.W.3d at 567 (quoting *Borst v. Chevron Corp.*, 36 F.3d 1308, 1323 (5th Cir.1994)). ERISA precludes all modifications which do not purport to be formal amendments of a plan. *Id.* The West Gulf Bank Severance Schedule does not comply with the procedure of amending the plan set out in Tyco's ERISA Severance Plan, nor was it written and distributed by a person identified as having the authority to amend the

plan. The West Gulf Bank Severance Schedule does not purport to be a modification of Tyco's ERISA Severance Plan. *See id.*

Thus, we hold that the trial court did not err in concluding that the contracts underlying this suit sought severance under the terms of the schedule set forth in the West Gulf Bank Severance Schedule and that this schedule was not associated with or related to an ERISA plan.

We overrule Tyco's fifth issue and its eighth issue insofar as it refers to the meaning of the term "standard severance."

**B. Preemption of the Gimpel Employees' Claims**

 Having determined the nature of the claims raised by the Gimpel employees, we now turn to the question of whether the Gimpel employees' breach-of-contract claims are preempted by ERISA. Specifically, we address Tyco's first issue, arguing that the trial court erred in finding that the Gimpel employees' claims were not preempted by ERISA; its second issue, arguing that the trial court's findings that the Gimpel employees' contracts were not related to Tyco's ERISA Severance Plan were not supported by legally and factually sufficient evidence; its third issue, arguing that the Gimpel employees' claims are related to ERISA because "the [Gimpel employees] sought and the trial court awarded them severance pay damages in amounts identical to the severance pay that they would have been due under Tyco's ERISA-governed severance plan, and [the Gimpel employees] stipulated that the amounts were calculated in accordance with the terms of Tyco's Severance Plan"; and its fourth issue, arguing that the Gimpel employees' claims are related to ERISA because the severance pay amounts that the Gimpel employees stipulated they were owed can only be calculated under Tyco's Severance Plan.

The Gimpel employees' breach of contract claims are based on Tyco's alleged breach of the RIAs or on the alleged breach of oral agreements to pay severance in accordance with the West Gulf Bank Severance Schedule. These agreements are not themselves an "employee welfare benefit plan" or "welfare plan" as defined by ERISA section 1002(1). *See* 29 U.S.C. § 1002(1) (defining those terms as "any plan, fund, or program ... established or maintained by an employer ... for the purpose of providing for its participants ... benefits in the event of ... unemployment ..."); *see also Greathouse*, 40 S.W.3d at 565 ("A plan under ERISA is established if, from the surrounding circumstances, a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits."). Rather, the RIAs state that they were designed to provide an incentive for highly desirable employees to remain at Tyco in order to keep the Gimpel Unit functioning and valuable. The employees with oral agreements also alleged that they were promised a severance payment for remaining employed with the Gimpel Unit. Thus, the Gimpel employees claims for breach of these contracts do not "relate to" an employee benefit plan "in the normal sense of the phrase." *See Shaw*, 463 U.S. at 96–97, 103 S.Ct. at 2900.

In looking both to the objectives of ERISA and to the effect of the asserted state law on ERISA plans, we determine that our conclusion does not run afoul of ERISA's purposes. *See Egelhoff*, 532 U.S. at 147, 121 S.Ct. at 1327. This case does not deal with a state law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy in conflict with the congressional intent to make the ERISA remedy exclusive and so

is preempted. *See Davila,* 542 U.S. at 209, 124 S.Ct. at 2495. Nor does it thwart such congressional intentions as creating uniformity in employee benefit laws. *See Fort Halifax,* 482 U.S. at 11, 107 S.Ct. at 2217; *see also Holland v. Burlington Indus. Inc.,* 772 F.2d 1140, 1147 (4th Cir.1985) (recognizing Congress's realization that national employers depend on ERISA's broad preemption provision to provide uniformity among employees employed in numerous states).

Our conclusion is also supported by the opinions of those federal courts that have addressed instances in which employers allegedly made promises to employees to pay severance benefits outside of existing ERISA-covered severance plans. *See Gresham,* 404 F.3d at 259; *Eide,* 329 F.3d at 605; *Crews,* 274 F.3d at 505.

Like the agreement in *Crews,* Tyco's contractual obligation to pay retention bonuses and severance was independent of its ERISA plan. *See* 274 F.3d at 505. Tyco's independent agreements with the Gimpel employees provided a higher amount of benefits than Tyco's ERISA Severance Plan to the employees to whom they were offered; and they did not provide any discretion to the employer in awarding those benefits if the conditions in the agreement were met, just as the Eighth Circuit noted in *Crews* in determining that the separate agreement at issue was not an ERISA plan. *See id.*

Similarly, the employer's offer of separate severance benefits in *Gresham* operated independently from the ERISA-governed plan because there were "substantial differences" between the plaintiff's severance benefits in his employment agreement and the terms of the ERISA-governed severance plan (specifically, the greater amount of benefits promised under the separate agreement) and because the severance award under the separate agreement would not be paid out of funds allocated to the ERISA-governed severance plan. *See* 404 F.3d at 259. These were the factors the Fourth Circuit examined to conclude that ERISA did not preempt the plaintiff's claims. *Id.* Here also, we have already established that the terms of the RIAs are substantially different from the severance provided by Tyco International's ERISA-governed Severance Plan. *See id.* Although it is not clear from the record exactly what source was intended to pay the benefits owed under the individual agreements with the Gimpel employees, it is clear that the agreements did not "indicate[ ] that the [Tyco International ERISA-governed] severance plan even exists." *See id.* at 261.

Thus, we conclude that the RIAs are separate and independent from Tyco's ERISA Severance Plan, do not "relate to" that plan "in the ordinary sense of the word," and are not preempted by ERISA.

Tyco argues, however, that the RIAs "relate to" its ERISA Severance Plan through their reference to "standard Severance." Tyco also argues that the calculation of damages, as provided in the stipulation, requires that the parties refer to Tyco's ERISA Severance Plan because that is the only document containing provisions for addressing issues such as calculating years of service where an employee has a break in service. We have already held that the severance schedule referenced in the RIAs is a reference to the West Gulf Bank Severance Schedule, which does not qualify as ERISA plan and did not modify Tyco's ERISA Severance Plan. Thus, we conclude that this reference is "too tenuous, remote, or peripheral ... to warrant a finding that the [agreement] 'relates to' the plan." *See Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21; *see also Fort Halifax,* 482 U.S. at 7, 107 S.Ct. at 2215 ("ERISA's pre-emption

provision does not refer to state laws relating to 'employee benefits,' but to state laws relating to 'employee benefit *plans.*' ").

We hold that the Gimpel employees' state law claims for breach of the RIAs and oral agreements are not preempted by ERISA.

We overrule Tyco's first, second, third, and fourth issues.

Having determined that the Gimpel employees' claims are not preempted by ERISA, we turn to the legal and factual sufficiency of the trial court's findings on the enforceability and breach of the alleged agreements.

### Contract Claims

In part of its sixth, seventh, and eighth issues, Tyco argues that the trial court's findings that Tyco entered into binding and enforceable oral and written contracts to pay severance are not supported by legally or factually sufficient evidence. In its ninth issue, Tyco argues that the trial court's conclusion that it breached its contracts with the Gimpel employees is clear error and that it is supported by no evidence or insufficient evidence.

### A. Oral Agreements [5]

Six employees base their breach of contract claims on alleged oral agreements, in which they assert that Tyco promised to pay them severance if they remained employed at the Gimpel Unit until it was closed or sold. In part of its sixth and seventh issues, Tyco challenges the trial court's conclusion that it entered into valid and binding oral agreements with some of the Gimpel employees.

 The elements of a valid contract are (1) an offer, (2) an acceptance, (3)

a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). The elements of written and oral contracts are the same and must be present for a contract to be binding. *Wal–Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

 For an agreement to be enforceable, there must be a meeting of the minds with respect to its subject matter and essential terms. *Id.* at 556. The determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did. *Id.* The execution of a contract includes the performance of all acts necessary to render it complete as an instrument. *Verson Allsteel Press Co. v. Carrier Corp.*, 718 S.W.2d 300, 303 (Tex.App.-Tyler 1985, writ ref'd n.r.e.) (per curiam).

 The question of whether a contract contains all the essential terms for it to be enforceable is a question of law. *Beal Bank, S.S.B. v. Schleider*, 124 S.W.3d 640, 653 n. 8 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). What terms are material or essential to a contract are determined on a contract-by-contract basis, depending on the subject matter of the contract at issue. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex.1992) ("Each contract should be considered separately to determine its material terms.").

 There is no evidence of any valid oral agreements in this case. The only one of the six employees claiming breach

---

5. Justice Sharp also joins the portion of Justice Keyes's opinion holding that the alleged oral agreements are unenforceable and that

the written RIAs are binding, enforceable contracts.

of an oral agreement who testified was Chris Luckey. He testified that Warman, Tyco's HR representative, told him not to leave or he would not receive severance pay. Luckey did not testify regarding the specific severance pay Warman was referring to in making that statement, nor did he testify regarding what specific severance pay benefits he was expecting to receive. He also testified that he did not rely on the expectation of severance pay in making his decision whether to keep working for Tyco or to look for another job.

Luckey's testimony is insufficient to support the existence of any of the elements of a contract between Luckey and Tyco. *See Prime Prods., Inc.*, 97 S.W.3d at 636 (holding that elements of valid contract include offer, acceptance, meeting of minds, each party's consent to terms, and execution and delivery of contract with intent that it be mutual and binding); *Lopez*, 93 S.W.3d at 555 (holding that elements of contract are same for oral and written contracts and must be present for contract to be binding). It does not support a finding that Tyco made an offer to Luckey or that he accepted an offer, nor does it demonstrate a meeting of the minds as to the subject matter of a contract between Tyco and Luckey or the essential elements of the contract. Regarding the remaining five Gimpel employees who based their claims on oral agreements, there is no evidence of any of the elements of a valid agreement between themselves and Tyco.

We sustain Tyco's sixth and seventh issues as they relate to the validity and enforceability of the oral agreements. We hold that the trial court erred in awarding the employees with oral contracts damages for breach of contract. *See Prime Prods., Inc.*, 97 S.W.3d at 636 (holding that party must prove existence of valid contract to prevail on breach of contract claim).

## B. Written Agreements

In its eighth issue, Tyco argues that the trial court erred in finding that the RIAs were valid and enforceable contracts because there was no evidence or insufficient evidence of a meeting of the minds. In its ninth issue, it argues that the evidence supporting the trial court's conclusion that Tyco breached its agreements with the Gimpel employees is legally and factually insufficient.

We conclude that the evidence supports the trial court's finding that the executed RIAs were binding contracts. The record clearly reflects a meeting of the minds between Tyco and the Gimpel employees who signed written RIAs as to the subject matter and essential terms of the offer, acceptance, and execution and delivery of the contract with the intent that it be mutual and binding. In each case, both parties executed the agreement with the intent that it be binding. Tyco promised Retention Bonuses—and "standard Severance in accordance to the severance schedule associated with the closure of this facility" in the event the employees were not offered "Comparable Employment with Tyco"—in return for key employees remaining employed with the Gimpel Unit through the Retention Period. The Gimpel employees accepted the terms of the RIAs by signing the agreements and by continuing to work in the Gimpel Unit.

To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of contract; and (4) the plaintiff's damages as a result of the breach. *Prime Prods., Inc.*, 97 S.W.3d at 636. The interpretation or construction of an unambiguous contract is a matter of law to be determined by the

court. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex.2003).

■■■ The RIAs provided that the employees would receive a specified Retention Bonus for remaining employed with Tyco through the defined Retention Period. It is undisputed that the Gimpel employees remained with Tyco through the Retention Period and that Tyco paid them their Retention Bonuses in accordance with the RIAs.

The RIAs also provided that Tyco would pay "standard Severance in accordance to the severance schedule associated with the closure of this facility" if the employees were "not offered Comparable Employment with Tyco." "Comparable Employment" was defined to mean "that within 30 days after the end of the Retention Period, the Employee is offered employment with the Company of comparable pay, status and skill level at a location that is within 25 miles of Employee[']s current work location." The RIAs also provided that the terms "Tyco" or "Company" would mean "Tyco Valves and Controls, its successors and assigns."

It is undisputed that the Gimpel employees received offers of employment with Dresser Rand, the purchaser of the Gimpel Unit, within thirty days of the end of the Retention Period that were comparable in pay, status, and skill level and in a location within twenty-five miles of their previous work location for Tyco. It is also undisputed that Tyco did not pay severance benefits to the Gimpel employees.

The Gimpel employees argue that the RIAs provided that they were to receive severance in the event they were not offered Comparable Employment with Tyco; their subsequent employment by Dresser Rand does not qualify as Comparable Employment with Tyco; and, thus, they were entitled to severance payments consistent with the terms of the RIAs. Tyco, however-er, argues that it negotiated with Dresser Rand to ensure that all of the Gimpel Unit employees received equivalent jobs satisfying the definition of Comparable Employment in the RIAs. It argues that the RIAs' provision defining "Tyco" and "Company" to include Tyco Valves and Controls and its "successors and assigns" means that employment with the purchaser of the Gimpel Unit satisfies the requirement for "Comparable Employment with Tyco." Thus, Tyco argues, it fulfilled its contractual obligations under the RIAs.

■■■ The term "successor" in contract law is a term of art. *See Int'l Ass'n of Machinists, Lodge No. 6 v. Falstaff Brewing Corp.*, 328 S.W.2d 778, 781 (Tex. Civ.App.-Houston 1959, no writ). A successor is "one who replaces or follows a predecessor" or "[a] corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." BLACK'S LAW DICTIONARY 1569 (9th ed. 2009).

■■■ When applied to corporations, the term

> "successor" does not ordinarily connote an assignee, but is normally used in respect to corporate entities, including corporations becoming invested with the rights and assuming the burdens of another corporation by amalgamation, consolidation, or duly authorized legal succession, and does not contemplate acquisition by ordinary purchase from another corporation. . . .

*Falstaff Brewing*, 328 S.W.2d at 781; *see Sitaram v. Aetna U.S. Healthcare of N. Tex., Inc.*, 152 S.W.3d 817, 826 (Tex.App.-Texarkana 2004, no pet.); *Farm & Home Savs. Ass'n v. Strauss*, 671 S.W.2d 682, 685 (Tex.App.-Dallas 1984, no writ).

The Texas statutory scheme concerning domestic business organizations supports the interpretation of "successor and assigns" language as extending responsibility or liability to an entity that expressly agrees to assume a liability or obligation as part of an asset purchase. Specifically, the Business Organizations Code provides:

> [A] person acquiring property described by this section may not be held responsible or liable for a liability or obligation of the transferring domestic entity *that is not expressly assumed by the person.*

Tex. Bus. Orgs.Code Ann. § 10.254(b) (Vernon 2011) (emphasis added).

 Thus, the use of the contractual language of "successors and assigns," when connoting assumption of future liability to perform a particular act—such as offering comparable employment—extends to a business entity that makes an express agreement to assume such an obligation as part of an asset purchase. *See id.; Falstaff Brewing*, 328 S.W.2d at 781; *see also Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex.1996) (per curiam) (holding that subsequent purchaser not liable to pay commission on lease because it did not expressly assume such liability); *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 780 (Tex.App.-Houston [1st Dist.] 2004, no pet.) (recognizing that in asset transfer, successor acquires assets of corporation without incurring any of grantor corporation's liabilities unless successor expressly assumes those liabilities).

Accordingly, the "successors and assigns" language binds an entity that merged with Tyco, a converting entity of Tyco, or an entity that agreed to assume liability for the contractual obligations outlined in the RIAs. *See* Tex. Bus. Orgs. Code Ann. §§ 10.008(a)(4) (Vernon 2011) (describing effects of merger on liability or obligation allocated under plan of merger);

10.106(3) (Vernon 2011) (providing that all liabilities and obligations of converting entity continue to converted entity); 10.254(b) (providing that person is not responsible for obligation or liability not expressly assumed by that person).

Here, Dresser Rand is a "successor or assign" of Tyco for purposes of the RIAs' obligation to extend "Comparable Employment" to the Gimpel employees if it expressly assumed Tyco's obligation to do so. The evidence demonstrates that each of the Gimpel employees was offered employment with Dresser Rand meeting the definition of "Comparable Employment" in their RIAs.

The trial court, however, found that employment with Dresser Rand was not equivalent to employment with Tyco and that the RIAs did not allow Tyco to avoid paying severance on the basis of job offers from Dresser Rand. The trial court also found that Dresser Rand was not a "successor or assign" of Tyco, did not assume any of Tyco's obligations to the Gimpel employees, and did not acquire Tyco itself. Rather, Dresser Rand simply purchased certain assets from Tyco Valves—namely the Gimpel Unit.

I conclude that the trial court misconstrued the Asset Purchase Agreement and relevant terms of the RIA. The plain language of the Asset Purchase Agreement required Dresser Rand to offer employment to the Gimpel employees under terms that met the definition of "Comparable Employment" in the RIAs, and Dresser Rand was included in the definition of "Tyco" in the RIAs. Thus, Dresser Rand was a successor of Tyco's obligation to offer the Gimpel employees Comparable Employment. *See* Tex. Bus. Orgs.Code Ann. § 10.254(b); *Falstaff Brewing*, 328 S.W.2d at 781. I further conclude that Tyco did fulfill the terms of the RIAs because it contractually required Dresser

Rand to assume Tyco's obligation to offer Comparable Employment to the Gimpel employees.

The Gimpel employees argue that Dresser Rand could not be the successor of Tyco because the Asset Purchase Agreement provided that Tyco would maintain its liability for payment of all preexisting employment benefit agreements, including any retention bonuses or severance due to Tyco's former employees.[6] However, this argument ignores the fact that the Asset Purchase Agreement specifically obligated Dresser Rand to offer jobs meeting the definition of "Comparable Employment" to the Gimpel employees and that it did so. Because the Gimpel employees were offered "Comparable Employment" by Tyco's successor, as provided by the terms of the RIAs, the explicit terms of the RIAs did not require payment of severance. Therefore, the provisions of the Asset Purchase Agreement addressing the allocation of liability for any such payments are irrelevant.

I conclude that the evidence was insufficient to support the trial court's conclusion that Tyco breached the RIAs.

I would sustain Tyco's ninth issue. I would hold that the trial court erred by awarding the Gimpel employees with RIAs damages for breach of contract.

### Response to the Concurrence

The concurrence would hold that the Gimpel employees' contract claims are preempted by ERISA, and, therefore, they may not be decided under state law, and also that the employees fail to state a claim for benefits under ERISA section 1132(a), the only section of ERISA over which the state courts have jurisdiction, and, there-

fore, they may not be decided as claims for benefits under ERISA 1132(a). *See* 29 U.S.C. § 1132(a).

The purpose of ERISA preemption is to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. *Fort Halifax*, 482 U.S. at 11, 107 S.Ct. at 2217. Under the well-established body of federal law that follows from *Fort Halifax*, only those severance agreements that require administration under an employer's ERISA plan are preempted by ERISA. *See, e.g., Tinoco*, 311 F.3d at 622; *Peace*, 462 F.3d at 441. I am unaware of any authority for the position taken by the concurrence that severance agreements made with employees outside of a company's ERISA severance plan cannot be decided under state law regardless of whether they require ongoing administration under the company's plan. Nor can I find any authority for the position that ERISA preempts state law claims for which it fails to provide a cause of action under ERISA section 1132(a). Nor does the concurrence cite any law in support of this argument other than the conclusory comment that the employees' claims in this case "relate to" an ERISA plan and are therefore both preempted and not cognizable under ERISA.

### Conclusion

We reverse the trial court's judgment and render judgment that the Gimpel employees take nothing by their breach of contract claims.

Justice MASSENGALE, concurring in the judgment only.

Justice SHARP, dissenting in part.

---

**6.** The dissent finds this argument persuasive and states that "[Dresser Rand] specifically did *not* take on Tyco's burdens concerning these employees." Op. at 780. However, this statement ignores the plain language of the Asset Purchase Agreement obligating Dresser Rand to offer Comparable Employment to the Gimpel employees.

MICHAEL MASSENGALE, Justice, concurring.

I concur only in the judgment of reversing and rendering a take-nothing judgment in favor of Tyco. The contract claims arising from non-payment of severance "relate to" an employee benefit plan governed by ERISA, and therefore the claims are substantively foreclosed by that statute's broad preemptive scope. A take-nothing judgment should be rendered because no other legal theory supports the employees' claims.

· The Tyco International (US) Inc. Severance Plan for U.S. Employees was adopted effective January 1, 2004. The Gimpel employees do not dispute that they were covered by this ERISA-governed severance plan at the time of its adoption.[1] Tyco's severance plan was amended and restated as of February 1, 2005. Consistent with ERISA's requirement that every employee benefit plan shall "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan," 29 U.S.C. § 1102(b)(3), the plan provided that it would continue until terminated pursuant to its own terms, and also that it could be amended by the board of directors of Tyco International Ltd. or by the board's delegee. The plan language effective as of February 1, 2005 also recited that its purpose was "to provide Eligible Employees with certain compensation and benefits as set forth in the Plan in the event the Eligible Employee's employment with the Company or a Subsidiary is terminated due to an Involuntary Termination."

Tyco entered into Retention Incentive Agreements with the appellees in connection with planning for the transfer and sale of the assets of the Gimpel Unit. Under the terms of the RIAs, each employee who signed an agreement and remained "an Active Employee of Tyco for the entire Retention Period" would become entitled to a "retention incentive bonus." The RIAs only referenced the payment of severance "in the event that the Employee is not offered Comparable Employment with Tyco." In that event, the RIAs provided for payment of "the standard Severance in accordance to the severance schedule associated with the closure of this facility."

The RIAs do not provide any independent basis for determining the amount to be paid as the "standard Severance," and they do not identify "the severance schedule associated with the closure of this facility." The Gimpel employees' contract claims thus depend on a combination of the RIAs and some other document that supplies the terms of the severance benefit. The Gimpel employees contend that the referenced schedule is not Tyco's severance plan, but instead it is a separate one-page document created in the summer of 2006 by Holly Kriendler, then the newly hired director of human resources for Tyco's Americas region. However, a cause of action may not be based upon written modifications of an ERISA plan that are not and do not purport to be a formal amendment of a plan following the proce-

1. ERISA applies to any employee benefit plan established or maintained by an employer engaged in commerce. *See* 29 U.S.C. § 1003(a)(1). Severance plans are included within the definition of employee welfare benefit plans. *See id.* § 1002(1) (defining "employee welfare benefit plan" and "welfare plan" to include, among other things, "any plan, fund, or program ... established or maintained by an employer ... to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants ... benefits in the event of ... unemployment"); 29 C.F.R. § 2510.3–1(a)(3) (definition of "welfare plan" includes "those plans which provide holiday and severance benefits, and benefits which are similar").

dures required by section 1102(b)(3). *See Borst v. Chevron Corp.*, 36 F.3d 1308, 1323 (5th Cir.1994); *Greathouse v. Glidden Co.*, 40 S.W.3d 560, 567 (Tex.App.-Houston [14th Dist.] 2001, no pet.). The appellees do not contend that Kriendler was the board's delegee for purposes of amending the ERISA plan (the undisputed evidence showed this was Tyco's senior vice president for human resources), nor do they contend that Kriendler's schedule was a valid amendment of the Tyco ERISA plan. If the West Gulf Bank Severance schedule was not the "severance schedule associated with the closure of this facility" on its own terms, it did not become such by operation of the RIAs. Accordingly, the Gimpel employees' contract claims may not be based upon terms supplied by the so-called West Gulf Bank Severance schedule.[2]

Instead, the only applicable "severance schedule associated with the closure of this facility" that could provide the basis for determining "the standard Severance" referenced by the RIAs was Tyco's ERISA-governed severance plan. The Gimpel employees' contract claims therefore "relate to" an ERISA plan.[3] A state-law claim " 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). State-law claims "having an effect on employee benefit plans relate to such plans and are therefore preempted by ERISA." *Cathey v. Metro. Life Ins. Co.*, 805 S.W.2d 387, 390 (Tex.1991). The contract claims at issue have the forbidden connection because the RIAs reference and borrow terms from Tyco's severance plan,[4] yet they also purport to modify the eligibility parameters of the severance benefit provided under that plan. Because they received continued employment by Dresser Rand, the Gimpel employees were not eligible for severance under the Tyco severance plan after the sale of the Gimpel Unit. As the Tyco ERISA severance plan explained"

> An Eligible Employee will not be eligible to receive severance benefits under any of the following circumstances:
>
> . . . .
>
> (ix) The Eligible Employee's employment with the Employer terminates as a result of a sale of . . . assets of the Employer . . . and the Eligible Employee accepts employment . . . with the purchaser. . . . The

---

**2.** Nor is the West Gulf Bank Severance schedule the proper basis for analyzing the question of ERISA preemption. The majority's analysis is simply misplaced to the extent it relies upon Kriendler's one-page schedule to define the contested severance benefit.

**3.** *See* 29 U.S.C. § 1003(a) (describing scope of ERISA's application to employee benefit plans). "ERISA preemption applies not only to state laws but to all forms of state action dealing with the subject matters covered by this federal statute." *Cathey v. Metro. Life Ins. Co.*, 805 S.W.2d 387, 390 (Tex.1991) (citing 29 U.S.C. § 1144(c)(1)).

**4.** Notably, the Gimpel employees' claimed damages are the same as would be due if severance were being claimed (and the appel-

lees were eligible to receive benefits) under Tyco's ERISA plan. This factor has been relied upon by other courts in concluding a claim was preempted by ERISA. *See, e.g., Epps v. NCNB Tex.*, 7 F.3d 44, 45 (5th Cir. 1993) ("When a court must refer to an ERISA plan to determine the plaintiff's retirement benefits and compute the damages claimed, the claim relates to an ERISA plan."); *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290, 1294 (5th Cir.1989); *Greathouse v. Glidden Co.*, 40 S.W.3d 560, 569 (Tex.App.-Houston [14th Dist.] 2001, no pet.). My conclusion that Gimpel employees' claims are preempted by ERISA is therefore bolstered by the fact that the employees' damages were based upon their stipulation at trial about "the calculated amount of severance" under the terms of Tyco's ERISA plan.

payment of Severance Benefits in the circumstances described in this subsection (ix) would result in a windfall to the Eligible Employee, which is not the intention of the Plan.

Tyco's severance plan thus specifically withheld severance benefits from employees who accepted employment from a purchaser, describing severance payments in such a circumstance as an unintended "windfall." The appellees contend that they are nevertheless entitled to receive the "standard Severance" despite accepting employment with Dresser Rand, relying upon the different eligibility language of the RIAs because they were not "offered Comparable Employment with Tyco." ERISA preempts any state-law contract claim that would modify the terms of the plan in this unauthorized fashion.[5]

The foregoing analysis of how the contract claims relate to an ERISA plan also explains why the employees' state-law contract claims for payment of severance are not entirely independent of an ERISA plan. The employees' contract claims

therefore cannot be analyzed under as if they were entirely independent of an ERISA plan, as has been the case in other circumstances in which a standalone severance agreement has been enforced because it was independent of the employer's separate ERISA plan providing severance benefits.[6]

Finally, the judgment in favor of the Gimpel employees cannot be affirmed by treating their claims as if they were claims for benefits under an ERISA plan. In some circumstances a state-law contract claim preempted by ERISA can be recharacterized as an enforcement action to obtain benefits under ERISA. *See* 29 U.S.C. § 1132(a)(1)(B), (e)(1); *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 66, 107 S.Ct. 1542, 1547, 95 L.Ed.2d 55 (1987). But even if we recharacterized the contract claims under the RIAs as claims for benefits under the Tyco severance plan, as explained above, the employees would not be entitled to severance payments because they were expressly excluded under the terms of the Tyco plan.[7]

**5.** *See* 29 U.S.C. § 1144(a) (providing for ERISA conflict preemption of "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in [29 U.S.C. § 1003(a)] and not exempt under [29 U.S.C. § 1003(b)]").

**6.** *See, e.g., Gresham v. Lumbermen's Mut. Casualty Co.*, 404 F.3d 253, 259 (4th Cir. 2005) (relying upon "substantial differences" between contract benefit and ERISA plan benefit and absence of indication that the contractual benefit would be paid from funds allocated to the ERISA plan); *Crews v. Gen. Am. Life Ins. Co.*, 274 F.3d 502, 505 (8th Cir.2001) (relying upon "significant differences between the company's existing plan and the promised benefits, as well as the lack of any evidence linking them to each other"). *Eide v. Grey Fox Tech. Servs. Corp.*, 329 F.3d 600 (8th Cir.2003), is distinguishable because the disputed benefits in that case "were not to be delivered pursuant to" the relevant ERISA plan; instead, they

were to be paid as a lump-sum payment. *Eide*, 329 F.3d at 605–06. In contrast, the claimed severance benefit under the RIAs was to be paid "in accordance to the severance schedule associated with the closure of this facility"—an ERISA plan which provided a severance benefit paid in the form of "salary continuation" constituting "Base Salary ... in equal installments over the Severance Period, per normal payroll cycles." The Gimpel employees therefore cannot rely upon the absence of any administrative scheme regulating the payment of benefits over time to distance themselves from ERISA's preemptive scope, as did the claimants in *Eide*. *See id.* at 605 (citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)).

**7.** The problem is not that the claim would not be "cognizable under ERISA," as Justice Keyes characterizes my analysis, but simply that any such claim would necessarily fail under the facts of this case.

Because I conclude that the Gimpel employees' claims are preempted by ERISA, and they may not be recharacterized as viable claims for benefits under ERISA, I concur only in the ultimate judgment of reversing the trial court's judgment and rendering judgment that the Gimpel employees take nothing from Tyco.[8]

JIM SHARP, Justice, dissenting.

I join the lead opinion's conclusion that this case is not preempted by ERISA, however, because I believe that Dresser Rand is not the "successor" to Tyco, I dissent. I would affirm the judgment of the trial court.

The Retention Incentive Agreements ("RIAs") provided that the Gimpel employees were to receive severance if they were not offered comparable employment with Tyco. The parties to the RIAs were Tyco Valves and Controls ("Tyco"), its successors and assigns, and the named employee in each RIA.

The Gimpel employees were not offered employment with Tyco after the sale of the plant. They were, however, offered employment with Dresser Rand, the company that bought the Gimpel Unit. Thus the only way to find that Tyco did not breach its contract with the Gimpel employees when it failed to pay the severance promised in the RIAs is to somehow find that Dresser Rand is the "successor" of Tyco.

The lead opinion makes this leap, despite that fact that Dresser Rand only bought an asset of Tyco, the Gimpel Unit, and that Tyco remained a corporation after its sale of the Gimpel Unit. It makes this leap despite the fact that the Asset Purchase Agreement specifically provided that Dresser Rand would not assume liability for:

> (i) any wages, salary, severance, bonuses ... (ii) any duties, obligations or liabilities arising under any employee benefit plan, policy, or practice ... or (iii) any other amounts due to any employees or former employees of the Business, in each case which accrue or arise prior to the Closing Date.... [1]

It makes this leap despite the fact that, pursuant to the Asset Purchase Agreement, after a prospective employee accepted an offer of employment with Dresser Rand, Tyco was to terminate that employee and *retain* responsibility for any severance or termination obligations due to the employee.[2]

In Texas, the term "successor corporation" has long been associated with the entity that succeeds to the property and corporate rights of a corporation. *See Thompson v. N. Tex. Nat'l Bank*, 37

---

8. Upon a determination that a state-law claim is preempted by ERISA, Texas courts have entered or approved judgments that render a take-nothing judgment. *See, e.g., Gorman v. Life Ins. Co.*, 752 S.W.2d 710, 714 (Tex.App.-Houston [1st Dist.] 1988), *aff'd in relevant part and rev'd on other grounds*, 811 S.W.2d 542 (Tex.1991); *Greathouse*, 40 S.W.3d at 570–71 (holding that state-law claims for severance pay were preempted by ERISA and affirming trial court's entry of take-nothing judgment). Two justices have agreed on this judgment of reversal and rendition of a take-nothing judgment, in satisfaction of TEX.R.APP. P. 41.1(a).

1. Asset Purchase Agreement, Section 1.5(b).

2. Asset Purchase Agreement, Section 4.1(d) ("Notwithstanding anything to the contrary contained in this Agreement, [Tyco] shall be solely responsible for the payment of any and all compensation, retention, separation, severance or similar payments due or to become due to any employee of [Tyco] (including any Prospective Employee or any Hired Employee) pursuant to any agreement, arrangement, commitment, applicable law, plan or course of dealing between such employee and [Tyco], including without limitation any termination payments or termination obligations arising in connection with this Agreement.").

S.W.2d 735, 739 (Tex. Comm'n App. 1931, holding approved). A "successor corporation" is normally used in respect to "corporations becoming invested with the rights and assuming the burdens of another corporation by amalgamation, consolidation, or duly authorized legal succession." *Procter v. Foxmeyer Drug Co.*, 884 S.W.2d 853, 861 (Tex.App.-Dallas 1994, no writ). Furthermore, this Court has held that "[t]he term 'successor' has ... been defined as 'one who takes the place that another has left, and sustains the like part or character.'" *Enchanted Estates Cmty. Ass'n, Inc. v. Timberlake Improvement Dist.*, 832 S.W.2d 800, 803 (Tex.App.-Houston [1st Dist.] 1992, no writ).

In this case, Dresser Rand did not become invested with the rights and/or assume the burden of Tyco by "amalgamation, consolidation, or duly authorized legal succession," nor did it take the place of Tyco. *Procter*, 884 S.W.2d at 861. Instead, it only bought assets from Tyco. Indeed, even within the context of hiring the Gimpel employees, it did not "assume the burden" of Tyco. *See id.* Dresser Rand merely agreed to hire Tyco's employees. It specifically did *not* take on Tyco's burdens concerning these employees. In fact, Dresser Rand specifically refused to assume liability for wages, salary, severance and bonuses due to the Gimpel employees, as well as for any duties or obligations arising under any employee benefit plans or severance packages. *See* Asset Purchase Agreement, Sections 1.5(b) and 4.1(d).

An agreement on the part of a corporation to hire employees pursuant to an asset acquisition with a second corporation is not tantamount to becoming the "successor" of that second corporation. The fact is that, pursuant to the Asset Purchase Agreement itself, Tyco was obligated to and did fire the Gimpel employees once Dresser Rand hired them. When Tyco fired the Gimpel employees, Tyco remained liable to them for the severance it had promised them, as the trial court found. Because I would affirm the trial court's judgment, I dissent.