**Affirmed in Part, Reversed in Part, and Memorandum Opinion filed August 24, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-21-00694-CV

---

## BORUSAN MANNESMANN PIPE US, INC., Appellant

## V.

## HUNTING ENERGY SERVICES, LLC, Appellee

---

**On Appeal from the 80th District Court
Harris County, Texas
Trial Court Cause No. 2020-38984**

---

## MEMORANDUM OPINION

Appellant Borusan Mannesmann Pipe US, Inc. ("Borusan") appeals a judgment in favor of appellee Hunting Energy Services, LLC ("Hunting") following a bench trial. In six issues, Borusan argues the trial court erred when it (1) found that Hunting did not owe Borusan defense and indemnity; (2) denied Borusan's claims for breach of contract and breach of warranty; (3) granted Hunting's claim for breach of contract; (4) granted Hunting's claims for negligence

and negligent representation; (5) found that Borusan must indemnify Hunting; and (6) awarded expert witness and mediation fees to Hunting. We affirm in part and reverse in part.

## I.  BACKGROUND

Borusan manufactures steel pipes by sourcing flat, raw steel material and forming it into a rounded, longitudinal tube. The abutting edges of the tube are then fused together through a process called electronic resistance welding ("ERW"), which uses a high frequency electric current, creating a weld seam or fusion line that runs longitudinally across the entire length of the pipe. Borusan then sells these steel pipes, sometimes with a threaded connection added to the pipes.

Hunting offers a service whereby it swages (or expands) and threads steel pipe with its proprietary threaded connection called Tec-Lock Wedge ("TLW"). Hunting's TLW connection does not require an external coupling to connect joints of pipe because the connection consists of expanding one end of the pipe and threading it on the inside of the pipe body (the "box end"), and then connecting the box end to a corresponding end of pipe that has been threaded on the outside of the pipe body (the "pin end").

Borusan markets and sells a turnkey, finished-end steel pipe product finished with Hunting's proprietary TLW connection, specifically: 5 1/2" 23.00# 0.415W P110CY ERW R2 Casing Hunting Tec-Lock Wedge Special Clearance Borusan Reg Mil and 5 1/2" 20.00# 0.361W P110CY ERW R3 Casing Hunting Tec-Lock Wedge Borusan Reg Mil. Borusan sold this finished-end pipe with Hunting's TLW proprietary connection to its customer Sooner Pipe LLC ("Sooner"). Sooner is a pipe distributor; the end user of the steel pipe underlying this dispute is Concho Resources, Inc. ("Concho").

## A. THE LAWSUIT

On June 30, 2020, Hunting filed the underlying lawsuit against Borusan. In its live pleading, Hunting alleged that, "[a]s part of manufacturing and selling its turnkey product, Borusan guarantees the quality of its manufacturing processes and steel, and certifies that its pipe, among other things, satisfies API 5CT and is fit for intended purposes, including swaging." Hunting further alleged:

> In early 2020, Borusan suffered a number of failures with its products, all of which were conclusively caused by defects in Borusan's steel and manufacturing processes. Borusan's defective products and manufacturing process not only caused harm to Borusan's customer, but also caused harm to Hunting and reflected poorly on Hunting and Hunting's intellectual property. Borusan's defective products and manufacturing processes also constituted a breach and default of the Parties' written Purchase Orders and a breach of the representations and warranties that Borusan made to Hunting about its product.

Hunting asserted causes of action for breach of contract based on the written purchase orders between Borusan and Hunting; declaratory judgment, seeking in relevant part declarations that Hunting has no obligation to indemnify Borusan and that Borusan is required to indemnify Hunting; negligence based on Borusan providing Hunting with defective, negligently manufactured pipe and by misrepresenting the quality of the pipe it provided, as well as the risks associated with its defective and substandard pipe; fraud and fraudulent inducement, based on false, material misrepresentations by Borusan to Hunting concerning Borusan's pipe and its manufacturing process; fraud by non-disclosure; negligent misrepresentation; breach of implied warranties of fitness; breach of implied warranty of merchantability; and "marketing defect."

Borusan filed an answer and asserted counterclaims for breach of contract and declaratory judgment. In Borusan's amended answer, it asserted counterclaims for breach of contract, breach of warranty, and declaratory relief, seeking

3

declarations that Borusan's terms and conditions of purchase applied to the pipe at issue, that Hunting is responsible for providing a defense to Borusan for any claims by Sooner or Concho, and that Hunting is responsible for indemnifying Borusan.

On September 2, 2021, the parties' claims were tried to the bench. After Hunting rested its case in chief, the trial court granted Borusan's motion for directed verdict on Hunting's claims of fraud, fraudulent inducement, and fraud by nondisclosure. On November 3, 2021, the trial court signed findings of fact and conclusions of law, which we summarize below.

## B.    FINDINGS OF FACT

This dispute concerns a turnkey, finished-end pipe that was sourced, manufactured, marketed, sold, and put into the stream of commerce by Borusan. Finished-end pipe means that the plain-end pipe has been "finished" with a connection, and Borusan markets and sells the product as being finished with Hunting's proprietary TLW connection. In late 2019 and early 2020, Borusan issued several written purchase orders ("POs") to Hunting, pursuant to which Borusan sold the turnkey, finished-end product to Sooner.[1]

Borusan certifies and promises that its steel complies with both the testing and performance requirements of the American Petroleum Institute's Specification 5CT ("API 5CT"),[2] as well as Borusan's promised performance requirements,

---

[1] The record includes several relevant documents of the relationship between Hunting and Sooner. Hunting issued Borusan quotes for the cost of applying its TLW connections to Borusan's pipe to satisfy Concho and Sooner's orders to Borusan. Borusan would subsequently issue a threading purchase order ("PO") to Hunting, which included Borusan's terms and conditions attached. Hunting would ultimately issue Borusan an invoice, which stated that Hunting's terms and conditions applied.

[2] Andrea Romero, Hunting's corporate metallurgical engineer and the group general manager for quality assurance for proprietary products, testified that "API 5CT is an industry standard that gives you the performance and testing requirements for casing and tubing." Borusan's material test report provides "WE CERTIFY THE ABOVE MATERIAL HAS BEEN

4

which are set forth both in API 5CT and in Borusan's commercial documents and representations. Hunting's only role with regard to Borusan's product is as a third-party vendor. Hunting was hired by Borusan for "threading services"—the application of Hunting's TLW connection to "finish" Borusan's plain-end pipe—so that Borusan can sell the turnkey, finished-end product to Sooner.

As part of Hunting's "threading services," Borusan requires that Hunting expand Borusan's pipe to a certain degree. Hunting plays no role in the manufacturing or certification of Borusan's plain-end pipe and has no responsibility for the metallurgy or integrity of Borusan's steel, the performance of Borusan's steel, or Borusan's compliance with any of Borusan's promised performance standards. In the threading POs, Borusan represents that its plain-end pipe will meet certain minimum performance standards, including the standards set forth in API 5CT.

Borusan also promises that its plain-end pipe satisfies the express representations made by Borusan in the performance data sheets that Borusan provides to Hunting. Specifically, Borusan promises that its plain-end P110 pipe has a minimum yield strength of 110,000 PSI, a maximum yield strength of 125,000 PSI, and a minimum tensile strength of 125,000 PSI. Hunting's connection and threading process operates within these promised performance criteria.

Hunting represents that its TLW connection will meet the standards set forth in the data connection sheets it provides to Borusan. There is no dispute that Hunting's TLW connection met all criteria and specifications set forth by Hunting.

MANUFACTURED, PROCESSED, SAMPLED, TESTED AND INSPECTED TO MEET THE REQUIREMENTS OF API 5CT . . . ." Likewise, Borusan's data sheets for its steel pipes provide that "[p]roprietary grade manufactured to guidelines of API 5CT, bears the API monogram."

Borusan's representations regarding the quality and performance capabilities of its plain-end pipe were false and material. As agreed by Borusan, and as confirmed by express incorporation into the Borusan-Sooner POs, both Hunting's standard terms and conditions and Borusan's standard terms and conditions of purchase apply to the threading POs.

In February, April, and May of 2020, a number of Borusan's finished-end products failed in the field. When Borusan notified Hunting of the pipe failures, Hunting hired third-party expert Element Materials Technology ("Element") to perform an investigation and conduct testing to determine the root cause of the pipe failures. Element issued reports on April 29, 2020 and May 12, 2020. Both reports conclude that the pipe failures were caused by Borusan's defective steel sourcing and/or defective manufacturing processes that necessarily resulted in plain-end pipe and turnkey, finished-end pipe that did not meet the standards Borusan represented it would, including those set forth in API 5CT and/or Borusan's performance data sheets.

At the same time, Sooner and Concho investigated the pipe failures by hiring another third party, Viking Engineering ("Viking"), to perform a failure analysis and publish reports documenting its testing and inspection results, findings, and conclusions. Like the Element reports, the Viking reports conclude that the cause of the pipe failures was Borusan's defective products and substandard manufacturing processes and not Hunting's work. Various forms of testing and examination by Viking revealed several types of metallurgical defects in Borusan's steel. The Viking reports conclude that Borusan's steel contains excessive levels of inclusions that prevent the weld line from fusing together in random, intermittent areas, resulting in a very brittle material that is susceptible to failure when loads are applied, and that these metallurgical defects were the result of Borusan's

defective sourcing of raw material, Borusan's defective ERW manufacturing process, or both. Thus, Viking concluded in its reports that Borusan's steel was unfit for its intended purposes, including swaging.

Borusan also conducted an internal micro examination on ten samples of Borusan's pipe that had cracked during Hunting's swaging operations. Borusan's micro examination confirmed the presence of the same metallurgical defects identified by Viking and Element. Borusan's metallurgist concluded that Borusan's pipe is metallurgically defective in ways that were necessarily caused by Borusan's defective manufacturing process.

The trial court found that these metallurgical defects caused the pipe failures and that they were not caused by Hunting's work in any way, directly or indirectly. Metallurgical flaws, anomalies, and defects in Borusan's plain-end pipe made Borusan's plain-end pipe weaker than Borusan promised, incapable of performing to Borusan's promised performance standards, and not suitable for Hunting's process, as Borusan had promised. The metallurgical defects in Borusan's steel can only be introduced and caused by Borusan, before the plain-end pipe is ever provided to Hunting for threading. Correspondingly, but for the metallurgical flaws, anomalies, and defects in Borusan's plain-end pipe, Borusan's plain-end pipe would have been suitable for Hunting's process, as promised by Borusan. Hunting's process did not and could not cause Borusan's finished-end product to fail to comply with the API 5CT standard or Borusan's performance data sheet, because the pipe already failed to comply with these standards when Borusan delivered it to Hunting.

## C.  CONCLUSIONS OF LAW

The trial court concluded that Borusan breached its contract with Hunting and that Hunting was entitled to judgment in its favor in the amount of

7

$1,931,291.86. The trial court concluded, in the alternative, that Hunting prevailed against Borusan on Hunting's claims for negligence and negligent misrepresentation. The trial court concluded that Borusan was not entitled to declaratory relief against Hunting and that Hunting was entitled to a declaratory judgment in relevant part that Hunting had no obligation to indemnify Borusan and that Borusan is required to indemnify Hunting pursuant to (1) Hunting's terms and conditions and (2) Texas Civil Practice and Remedies Code § 82.002. *See* Tex. Civ. Prac. & Rem. Code § 82.002 (providing that a manufacturer has a duty to indemnify a seller from losses arising out of a products liability action). Finally, the trial court concluded that Borusan take nothing by its remaining claims and that all claims and damages pursued by Borusan are denied in their entirety.

## D.    JUDGMENT

On May 25, 2022, the trial court entered a final judgment in favor of Hunting in the amount of $1,931,291.86. The trial court awarded Hunting $1,622,363.00 for the amount improperly withheld by Borusan on contracts wholly unrelated to the pipe failures at issue; $308,928.86 for testing and related expenses incurred by Hunting associated with the pipe failures; all applicable pre and post judgment interest; $881,489.21 in reasonable and necessary attorney's fees; $8,105.42 in reasonable expenses; $173,009.72 in reasonable expert witness fees; and appellate attorney's fees. The trial court also ordered that Hunting has no obligation to indemnify Borusan; that Borusan is required to indemnify Hunting from actions, claims, costs, damages, demands, fines, interest, judgments, liabilities, losses, penalties, proceedings, suits, and expenses arising from the failures of Borusan's products in February, April, and May 2020; and that Borusan has no contractual right to set off against the $1,622,363.00 currently due and owed to Hunting. Finally, the trial court rendered judgment that Borusan take

8

nothing on its claims and denied Borusan's claims in their entirety.

This appeal followed.

## II.    DISCUSSION

In its first issue, Borusan argues that the trial court erred when it concluded that Hunting did not owe Borusan defense and indemnity because there is legally insufficient evidence supporting the trial court's findings that Hunting's work did not cause the pipe failures and that Borusan gave Hunting pipe that was defective or weaker than promised.

### A.    STANDARD OF REVIEW

When specific findings of fact and conclusions of law are filed and a reporter's record is before the appellate court, the findings will be sustained if there is evidence to support them, and the appellate court will review the legal conclusions drawn from the facts found to determine their correctness. *Trelltex, Inc. v. Intecx, L.L.C.*, 494 S.W.3d 781, 789 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Findings of fact have the same force and dignity as a jury's verdict and are reviewable under the same standards of legal and factual sufficiency. *Id.*; *Foley v. Capital One Bank, N.A.*, 383 S.W.3d 644, 646 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

When a legal sufficiency challenge concerns an issue on which the appellant does not bear the burden of proof, we review it under a "no evidence" standard.

9

*See id.* at 810. A no-evidence challenge will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Serv. Corp. Intern. v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011).

Evidence is more than a scintilla if it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Mtr. Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). If, however, the evidence does no more than create a mere surmise or suspicion and is so slight as to necessarily make any inference a guess, then it is no evidence. *Id.*

We review a trial court's conclusions of law de novo. *State v. Heal*, 917 S.W.2d 6, 9 (Tex. 1996); *Potcinske v. McDonald Prop. Inv., Ltd.*, 245 S.W.3d 526, 529 (Tex. App.—Houston [1st Dist.] 2007, no pet.). When performing a de novo review, we exercise our own judgment and redetermine each legal issue. *Trelltex, Inc.*, 494 S.W.3d at 790. To make this determination, we consider whether the conclusions are correct based on the facts from which they are drawn. *Potcinske*, 245 S.W.3d at 529.

## B. INDEMNITY

The obligation to indemnify is a creature of contract and defined according to the terms therein. *Wagner v. Exxon Mobil Corp.*, 654 S.W.3d 613, 627–28 (Tex. App.—Houston [14th Dist.] 2022, no pet.). Whether indemnity exists is a rule of contract interpretation and should be determined by the court as a matter of law. *Griffin Indus., Inc. v. Foodmaker, Inc.*, 22 S.W.3d 33, 36 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). "An indemnity provision does not apply to claims between the parties to the agreement; instead, it obligates the indemnitor to protect

10

the indemnitee against claims brought by a person not a party to the agreement." *Coastal Transp. Co. v. Crown Central Petrol. Corp.*, 20 S.W.3d 119, 130 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

### 1. Analysis

Borusan bore the burden to prove it was entitled to indemnity from Hunting. Borusan's POs to Hunting include an indemnity provision, which states:

> 10. **INDEMNIFICATION.** Seller shall indemnify, defend, and hold Buyer and its affiliates and customers harmless from and against any and all losses, claims, damages or expense (including any reasonable attorney's fees) including those arising or related to bodily injury, death or damages to property, arising directly or indirectly from: (a) Seller's manufacture and/or supply of the Goods, (b) Seller's performance of Services, (c) any defect or alleged defect in the Goods, including but not limited to costs of investigation and defense, and consequential damages arising as a result of such defect or alleged defect (including, without limitation rig down time, cancelled or reduced orders, and chargebacks to Seller from Seller's end customer), (d) the negligence or willful misconduct of Seller, its agents or employees, (e) the infringement of any third party proprietary rights with respect to the Goods and/or Services, and/or (f) Seller's violation of any provision of the Purchase Order or these Terms and Conditions.

Borusan focuses on the language "arising directly or indirectly" in the indemnity provision and argues that Hunting's work was a but-for cause of the pipe failures.

The trial court made the following relevant findings of fact concerning Borusan's claim that Hunting owed it defense and indemnity:

> 4. Borusan breached the Threading POs by providing defective and sub-standard plain-end pipe that was defectively sourced, defectively manufactured, and did not meet the requirements of the API 5CT standard, the representations in Borusan's Performance Data Sheet, or both.
>
> . . .

11

29. Borusan also promises that its plain-end pipe satisfies the express representations made by Borusan in Borusan's Performance Data Sheets that it provides to Hunting. Specifically, Borusan promises that its plain-end P110 pipe has a Minimum Yield Strength of 110,000 PSI, a Maximum Yield Strength of 125,000 PSI, and a Minimum Tensile Strength of 125,000 PSI. Hunting's connection and threading process operates within these promised performance criteria.

. . .

39. Element issued two reports, on April 29, 2020 and May 12, 2020 (the "Element Reports"). Both reports conclude that the Pipe Failures were caused by Borusan's defective steel sourcing and/or defective manufacturing processes that necessarily resulted in plain-end pipe and turnkey, finished-end pipe that did not meet the standards Borusan represented it would, including those set forth in API 5CTand/or Borusan's Performance Data Sheets. The Element Reports are admissible expert testimony, are admissible business records, and are persuasive.

. . .

41. Viking issued four reports in June and August 2020 (the "Viking Reports"). Like the Element Reports, the Viking Reports conclude that the cause of the Pipe Failures was Borusan's defective products and substandard manufacturing processes, and not Hunting's work.

42. Various forms of testing and examination by Viking revealed several types of metallurgical defects in Borusan's steel.

43. The Viking Reports conclude that Borusan's steel contains excessive levels of inclusions that prevent the weld line from fusing together in random, intermittent areas, resulting in a very brittle material that is susceptible to failure when loads are applied. The Viking reports conclude that these metallurgical defects were the result of Borusan's defective sourcing of raw material, Borusan's defective ERW manufacturing process, or both.

. . .

52. The Pipe Failures were not caused by Hunting's work in any way, directly or indirectly. Hunting's process did not and could not cause Borusan's finished-end product to fail to comply with the API 5CT standard or Borusan's Performance Data Sheet, because the pipe already failed to comply with these standards when Borusan delivered

12

it to Hunting.

. . . .

63. Borusan's Terms and Conditions do not require Hunting to indemnify Borusan for the Pipe Failures.

64. Hunting's work did not breach any requirement or obligation of Borusan's Terms and Conditions.

Borusan argues that there was no evidence that it gave Hunting pipe that was defective or weaker than promised. Borusan also implicitly argues that there was no evidence that Borusan's defective or weaker pipe was the cause of the pipe failures and no evidence that Hunting was not responsible for the pipe failures.[3] However, as discussed below, the trial court's finding of fact number fifty-two— that the pipe failures were not caused by Hunting's work in any way, directly or indirectly—is supported by legally sufficient evidence. The record also includes legally sufficient evidence supporting the trial court's finding of fact number four—that Borusan provided Hunting with sub-standard and defective pipe that did not meet the representations in Borusan's data sheets.

Hunting presented the testimony of Gary Wooley, Ph. D. ("Dr. Wooley"), an expert in engineering metallurgy. Dr. Wooley testified that the examinations of Borusan pipes revealed that "the manufacturing defects, the inclusions and the lack of fusion were created during the manufacturing process by Borusan." He explained that inclusions are imperfections in the steel created or included at the time of manufacturing and that "[t]hey're unacceptable weak spots in the steel that do not have the properties that you would like in the steel." These focalized weak points cannot take the stresses applied by an expanding process like Hunting's and

---

[3] Specifically, Borusan argues that "[t]he trial evidence conclusively proved that Hunting's work was a but-for cause of the Pipe Failures." However, the trial court found that Hunting's work did not in any way directly or indirectly cause the pipe failures, a finding that supports the conclusion that Hunting is not required to indemnify Borusan.

"the stresses create a crack because that weak point can't bear any load."

Dr. Wooley further explained that a lack of fusion or lack of bonding occurs during the ERW process and results in "a poor bonding point that may not be continuous throughout the weld . . . ." He testified that the impact of these inclusions and lack of bonding is that "the pipe now has weak spots, weak spots in the weld line and weak spots in the inclusions, and those weak spots mean that the pipe will not be able to withstand the stress levels that it is expected to withstand."

Dr. Wooley testified that Borusan's data sheets provide that Borusan's steel pipes will have a minimum yield strength of 110,000 psi—that is, "stress level needs to be at least 110,000 psi before the material will begin to yield or deform plastically or permanently." Because Hunting's threading connection requires the pipe to be expanded, "everybody understands 110 is exceeded in the swaging process." Borusan's data sheet also states that the steel will have a maximum yield strength of 125,000 psi—that is, it is the upper limit of stress that the steel can take before becoming too brittle.

Dr. Wooley maintained that Hunting's swaging process did not apply stress greater than 125,000 psi, and thus, Borusan's pipe "didn't do what it was supposed to do." Dr. Wooley concluded in his report that "the pipe was not fit for swaging because of the anomalies that were found . . . ."

Hunting also presented the testimony of Andrea Romero ("Romero"), Hunting's corporate metallurgical engineer and the group general manager for quality assurance for proprietary products. Romero explained that the application of Hunting's TLW connection involves a three-step process: (1) the pipe is expanded for the box end; (2) the box end is stress relieved; and (3) the box end is threaded. Romero testified that Viking analyzed two groups of material: (1) pipe that actually failed in the field, and (2) pipe that Concho had in inventory. Romero

14

testified that she saw consistent metallurgical defects along the weld fusion line of Borusan's pipe in the raw data in Viking's reports.

Romero also testified that Hunting hired Element to perform a root cause analysis of the pipe failures and that Element concluded that the root cause of the failures was the presence of penetrators—i.e., an indication of lack of fusion at the weld line. Romero explained "because there was [sic] these penetrations present in the weld—this affected the entirety of the weld and, therefore, ultimately had a brittle effect on the material, which ultimately means it was weaker than what was stated on" Borusan's data sheets. Romero testified that Hunting "determined pretty much the same thing that Element did, that there was a lack of fusion at the weld line that ultimately weakened the material because of a loss of plasticity." Romero stated that a lack of fusion "will occur during the welding process at the pipe manufacturing mill" and it is "metallurgically impossible for [Hunting] to have anything to do with the weld line."

Hunting also presented the testimony of Amanda Malinoff ("Malinoff"), the material and processes engineer for Hunting's connection technology division. Malinoff testified that the cause of the pipe failures was "intermittent weld line defects" and metallurgical defects, including "evidence of inclusions, of lack of fusion, and temper embrittlement." Malinoff testified that these metallurgical defects "would come from the actual welding process" and that there is nothing that Hunting does to the pipe that can cause the pre-existing inclusions to grow or to get bigger; "[t]hese are pre-existing from, say, the manufacturing process or as received in the raw material."

Borusan presented the testimony of Todd Reeves ("Reeves"), Borusan's director of quality. Reeves testified that Borusan is responsible for the weld in the pipe and that Borusan's pipe subject to the dispute—P110-CY—is pipe with

specific testing characteristics as well as specific performance characteristics. Reeves explained that Borusan's data sheets state that its P110-CY pipe has a minimum yield strength of 110,000 psi and a minimum tensile strength of 125,000 psi and that this means that all of the pipe has those performance characteristics.

This is legally sufficient evidence to support the trial court's findings number four and fifty-two noted above. *See Ford Mtr. Co.*, 135 S.W.3d at 601. Based on these findings, we cannot conclude that the trial court erred when it concluded that Hunting did not owe Borusan indemnity. *See id.*

We overrule Borusan's first issue.

## C. BREACH OF CONTRACT

In its second issue, Borusan argues the trial court erred when it denied its breach of contract and breach of warranty claims. Borusan argues that "[t]he evidence . . . conclusively established that Hunting's connection manufacturing did not comply with the Threading POs' specifications and its promised level or performance" because Hunting's connection brought Borusan's pipe out of compliance with API 5CT. In its third issue, Borusan argues that the trial court erred when it granted Hunting's claim for breach of contract. We address these issues together.

What constitutes a breach of contract is a question of law, but whether the breaching conduct occurred is a question of fact. *See Bartush-Schnitzius Foods v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam).

The trial court made the following conclusions of law concerning the breach of contract claims:

1. The Threading POs are valid and enforceable contracts.
2. Hunting fully performed its obligations under the Threading POs

16

and is a proper party to sue for breach of the Threading POs.

3. Borusan breached the Threading POs by refusing to pay Hunting the $1,622,363 it admittedly owed, because it had no valid legal justification under the Threading POs for withholding payment.

4. Borusan breached the Threading POs by providing defective and sub-standard plain-end pipe that was defectively sourced, defectively manufactured, and did not meet the requirements of the API 5CT standard, the representations in Borusan's Performance Data Sheet, or both.

. . .

9. Hunting did not breach the Threading POs. Hunting's performance met the requirements of the Threading POs and Borusan's Terms and Conditions. Moreover, neither the Threading POs nor Borusan's Terms and Conditions require Hunting to indemnify Borusan for the Pipe Failures, so its refusal to do so is not a breach of contract.

As noted above, there is legally sufficient evidence supporting the trial court's finding that the pipe failures were caused by imperfections and defects created during Borusan's manufacturing process and not by any of Hunting's work. There is also legally sufficient evidence that Borusan's pipes did not meet the performance specifications in Borusan's data sheets for the pipes and that nothing Hunting did during its threading process could cause Borusan's pipe to fail to comply with Borusan's performance data sheet for the pipes. Finally, there is legally sufficient evidence that Hunting's connection complied with the Threading POs specifications and promised level or performance and that that the connection worked as intended and did not fail.

We conclude that the trial court did not err when it concluded that Borusan breached the contract between Borusan and Hunting and that Hunting did not breach the contract. We overrule Borusan's second and third issues.[4]

---

[4] Because we overrule Borusan's third issue, we need not address its fourth issue challenging the trial court's ruling on Hunting's negligence and negligent representation claims,

17

**D.**    **DECLARATORY JUDGMENT**

In its fifth issue, Borusan argues the trial court erred when it entered a declaratory judgment that Borusan must indemnify Hunting. Borusan presents two arguments: (1) it is not bound by the indemnity provision in Hunting's terms and conditions; and (2) it does not owe a statutory indemnity under the Texas Products Liability Act.

A person interested under a written contract, or whose rights, status, or other legal relations are affected by a contract, may have determined any question of construction or validity arising under the instrument or contract and obtain a declaration of rights, status, or other legal relations thereunder. Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a). We review declaratory judgments under the same standards as other judgments. *Id.* § 37.010. We look to the procedure used to resolve the issue below to determine the standard of review on appeal. *Lidawi v. Progressive Cty. Mut. Ins.*, 112 S.W.3d 725, 730 (Tex. App.—Houston [14th Dist.] 2003, no pet.). The elements of a valid contract are (1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Tyco Valves & Controls, L.P. v. Colorado*, 365 S.W.3d 750, 771 (Tex. App.—Houston [1st Dist.] 2012), *aff'd*, 432 S.W.3d 885 (Tex. 2014).

### 1. Indemnity Provision in Hunting's Terms & Conditions

Borusan argues that it is not bound by the indemnity provision in Hunting's terms and conditions because Borusan's own terms and conditions state that Borusan's terms and conditions are the only applicable terms between the parties, unless Borussan expressly agreed in writing to other terms. Borusan argues that

---

which are an alternative basis for Borusan's liability. *See* Tex. R. App. P. 47.4.

there is no evidence "that Borusan ever bound itself to the Hunting [terms and conditions], much less expressly agreed to them in writing as the Threading POs require."[5]

The trial court made the following additional relevant findings of fact:

24. Hunting is not a party to the Borusan-Sooner POs. However, the Borusan-Sooner POs are subject to Hunting's Terms and Conditions and Borusan's Standard Terms and Conditions of Purchase . . . apply to the Threading POs.

. . .

33. As agreed by Borusan, and as confirmed by express incorporation into the Borusan-Sooner POs, both Hunting's Standard Terms and Conditions and Borusan's Standard Terms and Conditions of Purchase . . . apply to the Threading POs.

34. The Threading POs from Borusan to Hunting and the Invoices from Hunting to Borusan, as well as the corresponding Borusan-Sooner POs are the commercial documents that govern the relationship between the parties, whereby Borusan manufactures and sells its turnkey, finished-end product-BMP P110 CY, 5.5 inch, 20 pound and 23 pound pipe with Tec-Lock Wedge Connection ([Borusan's] "Products")—to its customer Sooner.

The trial court then made the following conclusions of law:

1. The Threading [Purchase Orders ("POs")] are valid and enforceable contracts.

. . .

12. Because Borusan's plain-end pipe failed to meet its promised performance requirements:

    . . .

---

[5] Hunting's General Terms and Conditions of Sale provide "These terms and conditions apply to all sales of products by Hunting . . . . Acceptance of Buyer's Order is expressly limited to these terms and conditions, and the quotation, if any, and order acceptance issued by Seller . . . ." Travis Kelly, Hunting's sale and marketing manager, testified that Hunting would issue quotes to Borusan and then Borusan would issue a purchase order to Hunting. Hunting's quotes for services issued to Borusan do not provide that Hunting's terms and conditions apply. Hunting's invoices indicate that they are issued after the purchase order has been received.

19

b. Pursuant to both Hunting's Terms and Conditions and Texas Civil Practice and Remedies Code § 82.002, Borusan is required to defend, indemnify, release, and hold Hunting harmless from and against any and all actions, claims, costs (including without limitation, costs of investigation, litigation, and court costs), damages, demands, fines, interest, judgments, liabilities, losses, penalties, proceedings, suits (including appeal), and expenses (including without limitation, reasonable attorneys' fees) arising from the failures of Borusan's products in February, April, and May of 2020.

On appeal, Borusan argues that "[t]he Threading POs—including the attached Borusan [terms and conditions]—are undisputedly the parties' binding contract" and points our attention to the trial court's findings of fact filed prior to the judgment. Borusan then argues that "[n]othing [in the threading POs] obligates Borusan to indemnify Hunting; the contract obligates *Hunting* to indemnify *Borusan*." (emphasis in original).

However, contrary to Borusan's argument, the trial court also included a finding of fact in its final judgment that both the invoices from Hunting to Borusan relating to the pipe at issue and the purchase order from Borusan to Hunting are valid and enforceable contracts. If there is a conflict between the findings of fact recited in a judgment and the findings of fact issued separately by the trial court, then the latter findings will control for appellate purposes. Tex. R. Civ. P. 299a. Here, the trial court's finding in the judgment controls because the judgment was issued after its findings of fact and conclusions of law. *See id.*

On appeal, Borusan does not challenge this finding by the trial court included in the judgment, nor does it argue that Hunting's invoices are not valid and enforceable contracts. If the invoices are valid and enforceable contracts or part of the parties' valid and enforceable contracts, then Borusan is subject to Hunting's terms and conditions, including Hunting's indemnity provision.

20

Borusan cites no authority in support of its argument that it does not owe Hunting contractual indemnity and provides no legal analysis as to why the invoices are not valid and enforceable contracts. *See* Tex. Bus. & Com. Code Ann. § 2.207(b) ("The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (1) the offer expressly limits acceptance to the terms of the offer; (2) they materially alter it; or (3) notification of objection to them has already been given or is given within a reasonable time after notice of them is received."); *Long Island Pipe, Inc. v. QT Trading, LP*, No. 01-18-00012-CV, 2018 WL 3353015, at *5–6 (Tex. App.—Houston [1st Dist.] July 10, 2018, no pet.) (mem. op.) ("[U]nlike the 'mirror image' rule at common law, the mere fact that a merchant's acceptance form contains materially different terms than the offer does not mean that it will be considered a rejection or counter-offer." (quoting *Stelluti Kerr, L.L.C. v. Mapei Corp.*, 703 Fed. App'x 214, 225 (5th Cir. 2017) (per curiam))); *see also* Tex. R. App. P. 38.1(i). We decline to perform the research and analysis for Borusan to argue whether Hunting's invoices were valid and enforceable contracts. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *Canton-Carter v. Baylor College of Med.*, 271 S.W.3d 928, 931 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("Failure to cite legal authority or to provide substantive analysis of the legal issues presented results in waiver of the complaint."); *Grimm v.* Grimm, 864 S.W.2d 160, 163 (Tex. App.—Houston [14th Dist.] 1993, no writ) ("The burden of showing reversible error is on appellant as the complaining party."). Thus, we conclude that Borusan has failed to show on appeal that the trial court erred when it found that the Hunting invoices are valid and enforceable contracts. *See Grimm*, 864 S.W.2d at 163. Because this finding by the trial court remains unchallenged, we cannot conclude that the trial court erred

when it held that Borusan owed Hunting indemnity pursuant to Hunting's terms and conditions.

Borusan further argues that there is no evidence that Hunting's terms and conditions in the record that include the indemnity provision are the terms and conditions referenced in Hunting's invoices. Travis Kelley, Hunting's sales and marketing manager, testified concerning a copy of an invoice from Hunting to Borusan and explained that the copy was a typical invoice. This invoice states at the bottom "TERMS AND CONDITIONS APPLY AS STATED AT HUNTING-INTL.COM." There is also evidence of email communications between Borusan and Sooner in the record in which Borusan attaches Hunting's terms and conditions. This is some evidence supporting the trial court's implicit finding that Hunting's terms and conditions in the record are those referenced in the invoices to Borusan. *See Ford Mtr. Co.*, 135 S.W.3d at 601. Hunting's terms and conditions provide that the buyer of Hunting's services must indemnify Hunting.

We conclude that the trial court did not err when it entered judgment declaring that Borusan must indemnify Hunting pursuant to Hunting's terms and conditions.

### 2. Duty to Indemnify Pursuant to Texas Civil Practice & Remedies Code § 82.002

Borusan also argues that it does not owe statutory indemnity under the Texas Products Liability Act.[6]

> A manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act

---

[6] Although the trial court's declaration that Borusan must indemnify Hunting is affirmed based on the indemnity provision in Hunting's terms and conditions, the resolution of Borusan's argument concerning a manufacturer's statutory duty to indemnify pursuant to § 82.002 is necessary for the disposition of part of Borusan's sixth issue.

22

or omission, such as negligently modifying or altering the product, for which the seller is independently liable.

Tex. Civ. Prac. & Rem. Code Ann. § 82.002(a); *see Petrol. Sols., Inc. v. Head*, 454 S.W.3d 482, 491 (Tex. 2014). This duty to indemnify is triggered by the injured claimant's pleadings. *Petrol. Sols.*, 454 S.W.3d at 492; *Gen Motors Corp. v. Hudiburg Chevrolet, Inc.*, 199 S.W.3d 249, 256 (Tex. 2006) ("[W]e have stated that 'the duty is imposed only on the manufacturer of a product claimed in a petition or complaint to be defective.'" (quoting *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.3d 864, 866 (Tex. 1999))). "Specifically, the duty is triggered by allegations of a defect in the manufacturer-indemnitor's product and is not dependent on an adjudication of the indemnitor's liability." *Petrol. Sols.*, 454 S.W.3d at 492.

Here, there is no evidence of any pleading by any claimant asserting a products liability action against Hunting based on Borusan's pipe failures. On appeal, Hunting points to a demand letter from Sooner to Hunting and Borusan, which states:

> The purpose of this letter is to formally provide you with notice of a number of recent failures COG Operating LLC ("Concho") has experienced involving casing supplied by Sooner Pipe. The casing was manufactured by Borusan Mannesmann and had Hunting Energy Services TEC-LOCK Wedge connections. By copy of this letter, we are also providing notice to Borusan Mannesmann and Hunting Energy Services. However, we ask that you also notify them of this claim.
>
> . . .
>
> We believe that Sooner Pipe, Borusan Mannesmann, and Hunting Energy Services failed to comply with their warranties with respect to these materials, and that the materials supplied to Concho were defective. As a result, Concho has sustained significant damage, which it hereby demands compensation for.
>
> Please let us how you intend to proceed at your earliest convenience.

23

Thank you for your consideration.

Contrary to Hunting's argument, a demand letter is not a "products liability action" nor a pleading. *See* Tex. Civ. Prac. & Rem. Code Ann. § 82.001(2) (defining "products liability action" as "any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories"); *see Zachry Eng'g Corp. v. Encina Dev. Grp., LLC*, No. 14-22-00265-CV, __ S.W.3d __, __ (Tex. App.—Houston [14th Dist.] May 18, 2023, pet. filed) ("The term 'action' is generally synonymous with 'suit,' which is a demand of one's rights in court." (quoting *Jaster v. Comet II, Const., Inc.*, 438 S.W.3d 556, 563 (Tex. 2014) (plurality op))); *see also Fresh Coat, Inc. v. Parexlahabra, Inc.*, 424 S.W.3d 237, 243 (Tex. App.—Beaumont 2014, no pet.) ("[A]s commonly used, 'action' is generally used to refer to a legal proceeding. Courts, considering the meaning of the term 'action' in other statutes, have construed 'action' to mean a 'suit.'"). Nor does a demand letter support an inference that a product-liability claim has been filed. Accordingly, we conclude that there is no evidence in this record that Borusan owes a statutory-indemnity duty to Hunting pursuant to § 82.002. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 82.001(1)–(2), 82.002(a); *Jaster*, 438 S.W.3d at 568 (stating that "claimant" is defined as someone "who asserts a claim for relief within a lawsuit"); *Gen Motors Corp.*, 199 S.W.3d at 256 ("[A] product manufacturer has a statutory duty to indemnify a seller only if a claimant alleges that the product is defective, and an allegation of a defective finished product includes a component only if the allegation can fairly be read as being directed to the component as well . . . .").

24

We sustain Borusan's fifth issue in part and overrule it in part.

**E.     AWARDS IN THE JUDGMENT**

In its sixth issue, Borusan argues that the trial court's attorney fee awards and award of witness and mediation fees must be reversed. The trial court awarded Hunting $881,489.21 in reasonable and necessary attorney's fees; $8,105.42 in reasonable expenses; $173,009.72 in reasonable expert witness fees; and appellate attorney's fees.

**1.  Attorney's Fees**

Borusan first argues that we should reverse the award of fees and costs to Hunting because the trial court erred when it ruled in Hunting's favor on Hunting's claims for declaratory judgment and breach of contract.

Hunting may recover reasonable attorney's fees if it prevailed in its breach of contract claim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(b)(8). As previously concluded, the trial court did not err when it entered judgment in favor of Hunting on its breach of contract claim. Thus, there is a basis for the trial court's award of attorney's fees, and we reject this argument.

**2.  Expert Witness Fees**

Borusan argues next that the award of $170,859.72 to Hunting for reasonable expert witness fees must be reversed because these fees are not taxable court costs.[7] Hunting argues that the expert witness fees are recoverable pursuant to Borusan's indemnity obligations found by the trial court.

We review the trial court's award of costs for an abuse of discretion. *See*

---

[7] The trial court awarded Hunting $173,009.72 in "reasonable expert witness fees." On appeal, Hunting agrees with Borusan that $170,859.72 of this award was for expert witness fees and $2,150.00 was for mediation services.

25

*Simon v. York Crane & Rigging Co.*, 739 S.W2d 793, 795 (Tex. 1987). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Worford v. Samper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam).

"Generally speaking, the fee of an expert witness constitutes an incidental expense in preparation for trial and is not recoverable as court costs." *Messier v. Messier*, 458 S.W.3d 155, 168 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *May v. Ticor Title Ins.*, 422 S.W.3d 93, 106 (Tex. App.—Houston [14th Dist.] 2014, no pet.). In some instances, however, expert witness fees are recoverable under statutes permitting courts to award expenses in addition to costs and attorney's fees. *Messier*, 458 S.W.3d at 168.

Hunting's general terms and conditions of sale provide:

B. To the extent permitted by applicable law, Buyer agrees to indemnify and hold harmless all members of the Seller Group for any damages paid by the Seller Group in excess of the limitation of liability set forth in Section 11.A.

. . .

12. **Indemnification**: BUYER SHALL BE LIABLE FOR, AND SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS SELLER AND ITS AFFILIATES AND EACH OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS ("SELLER GROUP") FROM AND AGAINST ANY AND ALL CLAIMS WHICH ARISE OUT OF THE PERFORMANCE OF THE CONTRACT TO THE FOLLOWING: (I) LOSS OF OR DAMAGE TO ANY WELL OR HOLE OR ANY THIRD PARTY OIL AND GAS PRODUCTION FACILITIES; (II) RESERVOIR SEEPAGE OR POLLUTION ORIGINATING UNDERGROUND OR FROM THE PROPERTY OF BUYER OR ANY THIRD PARTY HOWSOEVER, (III) BLOW-OUT, FIRE, EXPLOSION, CRATERING OR ANY WELL OR RESERVOIR OR ANY OTHER UNCONTROLLED WELL CONDITION (INCLUDING THE COSTS TO CONTROL A WILD WELL AND THE REMOVAL OF

DEBRIS); (IV) DAMAGE TO OR ESCAPE OF PRODUCT, OR SUBSTANCE FROM ANY FACILITY, INCLUDING ANY PIPELINE OR OTHER SUBSURFACE FACILITY; AND/OR (V) BODILY INJURY, PROPERTY DAMAGE AND ANY RELATED DAMAGES TO THIRD PARTIES. IT IS THE EXPRESS INTENTION OF BOTH BUYER AND SELLER THAT THE INDEMNITY PROVIDED FOR IN THIS PARAGRAPH IS AN INDEMNITY BY BUYER TO INDEMNIFY AND PROTECT SELLER GROUP FROM THE CONSEQUENCES OF SELLER GROUP'S OWN NEGLIGENCE, FAULT OR STRICT LIABILITY, WHETHER THAT NEGLIGENCE, FAULT OR STRICT LIABILITY IS THE JOINT OR CONCURRING CAUSE OF A CLAIM, LOSS OR EXPENSE (BUT EXPRESSLY EXCLUDING THE SOLE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SELLER GROUP).

Contrary to Hunting's argument, Hunting's indemnity provision does not provide that Borusan is to indemnify Hunting for all costs, expenses, or incidental expenses in pursuing Hunting's claims; instead, the provision declares that Borusan is to indemnify Hunting for *claims* arising out of the performance of the contract. *See Wagner*, 654 S.W.3d at 627–28; *Coastal Transp. Co.*, 20 S.W.3d at 130; *see also DBHL, Inc. v. Moen Inc.*, 312 S.W.3d 631, 635 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ("Courts may not expand the parties' rights and responsibilities beyond the limits defined in an indemnity contract."). Accordingly, we reject Hunting's argument that the indemnity provision allowed the trial court to award the expert witness fees.

Hunting argues next that the award of expert witness fees may be affirmed based on the trial court's finding that Borusan must indemnify Hunting pursuant to § 82.002. However, we previously concluded that the trial court erred when it rendered judgment declaring that Borusan must indemnify Hunting pursuant to § 82.002.

We conclude that the trial court erred when it awarded Hunting $173,009.72

27

in reasonable expert witness fees.

### 3. Mediation Fees

As to the award of $2,150.00 in mediation fees, Borusan argues that they are not recoverable as court costs unless mediation was court ordered. Hunting argues that the trial court had discretion to award mediation fees as court costs pursuant to Rule 141 of the Texas Rules of Civil Procedure and that they can be recovered as "other reasonable expenses" under Hunting's contractual indemnity provision or § 82.002.

When a mediator is appointed by the court, the trial court may set a reasonable fee for the services of the mediator and tax the fee as costs of suit. *See* Tex. Civ. Prac. & Rem. Code Ann. § 154.054; *Decker v. Lindsay*, 824 S.W.2d 247, 249 (Tex. App.—Houston [1st Dist.] 1992, orig. proceeding). Here, there is no evidence in the record indicating that the trial court appointed a mediator for which the $2,150.00 in mediation fees was assessed.

Additionally, "[t]he court may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or these rules." Tex. R. Civ. P. 141. "Rule 141 has two requirements—that there be good cause and that it be stated on the record." *Furr's Supermkts., Inc. v. Bethune*, 53 S.W.3d 375, 376–77 (Tex. 2001). Here, the trial court did not state anywhere in the on the record that it was awarding the mediation fees for good cause or what good cause existed to serve as the basis for such an award. *See* Tex. R. Civ. P. 141.

Finally, as noted above, Hunting's indemnity provision does not state that Borusan must indemnify Hunting for all reasonable expenses arising out of the performance of contract, and the trial court erred when it declared that Borusan must indemnify Hunting pursuant to § 82.002. Thus, we conclude the trial court

28

erred when it awarded Hunting $2,150.00 for mediation fees.

We sustain Borusan's sixth issue in part and overrule it in part.

## III. CONCLUSION

We reverse the portion of the trial court's judgment ordering Borusan to indemnify Hunting pursuant to Texas Civil Practice and Remedies Code § 82.002 and the award to Hunting of $173,009.72 for expert witness fees and mediation fees. We affirm the remainder of the judgment.

/s/ Margaret "Meg" Poissant
Justice

Panel consists of Justices Wise, Jewell, and Poissant.